JAMES J. LEWIS, Administrator v. THE CITY OF RALEIGH.

*Public Prisons--Treatment of Prisoners--Towns and Cities--Action for Damages.*

1. Under the provisions of the Constitution, Art. XI, § 6, and Bat. Rev. ch. 89, §§ 9, 10, the least that is required is that persons confined in any public prison shall have a clean place, comfortable bedding, wholesome food and drink, and necessary attendance.

2. Where A. was arrested at night by a policeman for violation of an ordinance of the City of Raleigh and confined in the city guard-house in which he died before morning, and in an action for damages instituted by his Administrator against the City, the jury found that his death was "accelerated by the noxious air of the guard-house," *Held*, that the plaintiff is entitled to recover.

CIVIL ACTION for Damages, tried at Spring Term, 1877, of WAKE Superior Court, before *Buxton, J.*

The plaintiff's intestate, John Godwin, was arrested by one of the policemen in the service of the defendant in June, 1875, for an alleged violation of a City ordinance, and confined in the City guard-house where he died. It was alleged that his death was caused by the unwholesome condition of the prison, occasioned by neglect of the City authorities. Upon the issues submitted the jury found the following facts :

1. John Godwin was arrested with probable cause by authority of the defendant, and imprisoned in the guard-house.

2. The death of John Godwin was accelerated by the noxious atmosphere of said guard-house.

3. Damages, $2,000.

Upon this verdict the Court gave judgment for the plaintiff, and the defendant appealed.

*Messrs. T. M. Argo* and *A. M. Lewis,* for plaintiff.
*Messrs. Busbee & Busbee* and *D. G. Fowle,* for defendant.

READE, J.  " It shall be required by competent legislation that the structure and superintendence of penal institutions of the State, the County jails and City police prisons, secure the health and comfort of the prisoners."  Const. Art. XI. § 6.

" The Sheriff or keeper of any public prison shall every day cleanse the room of the prison, * * * and shall furnish the prisoners a plenty of good and wholesome water three times in every day, and shall find each prisoner fuel, * * * wholesome bread * * * and every necessary attendance, * * * good warm blankets or other suitable bed clothing * * * for their use and comfort, as the season or other circumstances may require."  Bat. Rev. ch. 89, § § 9, 10.

From the foregoing quotations it will appear generally what is contemplated by our Constitution and statutes shall be the treatment of prisoners.  The least that is required is, that they shall have a " clean place, comfortable bedding, wholesome food and drink, and necessary attendance."  This is required for *all* prisoners, even those who are convicted of high crimes.  How much more ought it to be required for those who have not been convicted at all, and who may be innocent of any offence, as is often the case with those who are imprisoned before trial for safe keeping.

" All persons found lying on the streets in the City shall be taken and lodged in the guard-house." Ordinance of the City of Raleigh, ch. 4, § 3.

The plaintiff's intestate was found lying on the street, and taken by the City's police and lodged in the guard-house. "The guard-house is the City's guard-house, the ordinance is the City's ordinance, the officer is the City's officer—every thing was of and by the City. No question arises as to how far the City is liable for the misconduct of its officers, because the act complained of is the act of the City itself. 

Was the guard-house a suitable place in which to "lodge" the deceased ? The jury proved the fact that the death of the deceased was " accelerated by the noxious air of the guard-house."

It is insisted, however, that this finding does not mean much ; because, for instance, one falling in a fit in the open air and carried into the best house might be somewhat oppressed from lack of the free circulation of the open air, and his death which would have resulted out of doors in an hour might be accelerated a few moments in the house. We must see, therefore, what the facts were upon which the verdict was based. The guard-house was a small room 8x14 feet. It had no window. It had no opening connecting with the outer air or light. It had but one door, and that opened into a passage, and had a grate in it, and was opposite to a window which was under the grating in the pavement. Now here was no *passage* for the air, day or night, and none could be given. And there was no *ventilation* even, except the mere contact of the air inside the cell with the air outside, at the door, through the grate. There was nothing to drive the bad air out and the pure air in, and therefore the bad air would stay in indefinitely. So that it was an impossibility that such a place could " secure health and comfort," in the language of the Constitution, or that it could be " clean," in the language of the statute.

And further, the cell is not only under the ground and without ventilation, but it is under the City market-house, where congregate day and night crowds of persons and animals, and where are kept, meats, vegetables, melons and fruits, the impure emanations from which find a lodgment in the basement.

A moment's reflection will teach that it will not do to have a prison underground. There must be *circulation* of air. The bad air will not *go* out, it must be *driven* out. And there is the greater necessity as the prisoners cannot " go out," but all their calls must be answered in the cells. And such persons as can be employed to clean them are not likely to be very careful.

Nature teaches us that any person kept in such a place must soon die, and any person " lodged " in such a place is *injured* by the first breath.

But further, suppose the air had been pure and the ventilation perfect, still that is not all that is necessary to a prisoner's "comfort," and he must be comfortable ; not luxuriously surrounded, but the demands of humanity must be supplied ; and here was not a chair, nor a bed, nor a blanket, nothing but the cold, hard floor. Just what nature teaches would be the condition of such a cell, the witnesses on both sides teach us was its actual condition. They all say it was offensive, and to some it was so offensive that they had to leave it quick. And the intelligent physician called by the City, said, that while he saw no signs of death from carbonic gas, "yet if a man was so weak as to have to be carried there having fallen from exhaustion, he would be injuriously affected."

This case is striking proof of the wisdom of requiring prisons to be comfortable. So far as appears the deceased was not a bad man. He had a family and his employer testifies that he worked night and day to support them. He was in bad health. He was not a drunkard, but sometimes

drank too much—a weakness so common, that it would seem invidious to call it a crime in him. He had drunk too much, and instead of letting him go home as he asked to be allowed to do, or of carrying him home as it would have been humane to do, and as he who made him drunk was morally bound to do, he was carried to a hole like Calcutta's, where he died before morning.

No error.

PER CURIAM.                                        Judgment affirmed.