The complaint is as follows:
"The plaintiff, complaining of the defendant, alleges:
1. That the defendant is a municipal corporation, created by the laws of the State of North Carolina.
"2. That as such corporation it became the duty of defendant to provide proper facilities for heating the city prison so as to secure health and comfort of prisoners confined therein.
"3. That on the night of the ...... day of ........., 1887, the plaintiff was arrested by the police authorities of said city of Asheville, for an alleged violation of an ordinance of said city, and confined in the city prison until a late hour of the following morning. That night on which he was so confined in said prison was one of intense coldness and severity. That the room in which plaintiff was confined was situated on the third floor of the building, and a number of window-panes on opposite sides of the room were broken out, so that a strong current of bitterly cold wind passed through the room during the entire night. That (239) there was no fire, bed or other means provided for heating said room or protecting plaintiff from the inclemency and severity of the weather.
"4. That by reason of plaintiff's confinement in said prison, as aforesaid, and exposure incident thereto, he was forced to endure the most intense physical suffering. That his body was so benumbed and chilled that he was scarcely able to walk or talk. That in consequence of said exposure plaintiff contracted a most violent case of fever, from which he was confined to his bed for the period of eight weeks. That during said sickness he suffered the greatest agonies, and his life was almost despaired of for weeks, and that he has not since fully recovered his health, and is advised and believes he never will. That he was forced to pay large sums of money for medical treatment while suffering with said disease, viz., the sum of one hundred and fifty dollars.
"5. That by reason of the aforesaid wrongful act of defendant, and the expenses aforesaid, the plaintiff has been greatly damaged, viz., the sum of five thousand dollars.
"Wherefore, plaintiff demands judgment for the sum of five thousand dollars and the cost of this action." *Page 193 
The answer contained a general denial of facts alleged in every paragraph of the complaint. The issues and responses of the jury were as follows:
"1. Was the plaintiff injured by the negligence of the defendant, as alleged in the complaint?" "Yes."
"2. Did the plaintiff contribute to his said injury by his own negligence?" "No."
"3. What damages, if any, is the plaintiff entitled to recover by reason of said injury?" "$1,458.50."
The plaintiff introduced the following testimony:
Plaintiff, introduced as a witness for himself, testified as follows:
"In 1886 I lived in Madison County. On 5 January, 1887, I came to Asheville to sell tobacco. That night I got into a difficulty (240) and was put into the calaboose, and remained there all night. I was arrested at about 9 o'clock p. m., and put into the cage and locked up, and remained there until about 9 or 10 o'clock next morning. The officer that arrested me carried me before the mayor, Judge Aston, and he tried me and fined me two dollars and costs. I paid it. There were no comforts in the jail and no fire or place to sleep to amount to anything. It was one of the coldest nights that I ever saw. I suffered a great deal. Nothing in there but one old blanket. Some of the window lights were broken out. John Bell was confined with me. Next morning I was so cold I couldn't hardly walk down the steps; was cold all day. Had fever. Confined to my bed. After three or four weeks I was confined. Had cold. My head ached; unconscious a long time. Confined eight weeks in house and to bed three or four weeks. I am not as strong as I used to be, though my health is now good. I can't do the work I used to."
Cross-examined. — "I was intoxicated that night. I don't recollect having my coat off. I had been in and out of the bar-room nearly all day, after one o'clock. In the early part of the night, during my confinement in jail, I heard a roaring like a fire, but couldn't fell any warmth from it. I was sober then. I don't know that there was a drum in there. I didn't speak to Aston about suffering or being cold. I could talk pretty well next morning. I told the officer that I was so cold I didn't think I could walk down stairs. Do not know which officer it was. It was unusually cold weather. Before that I had been waiting on a sick man, staying around the house, etc. Had an aching in my head, shoulders, etc. I never had such a headache as that before. I was arrested for striking a boy in the bar-room."
George Bell, introduced by plaintiff, testified:
"I was in cage with plaintiff. It was coldest weather of the (241) winter. We were in cage on third floor. Window lights of room *Page 194 
broken out. One old, torn blanket was there. No fire there. I called for fire. They said they had no wood. I told them I'd pay for it. I was never so cold in my life. The suffering was intense. I never suffered so much with cold in my life."
Cross-examined. — "I had cold to settle on my lungs. I had been gathering ice that day — superintending — I did not work at it. There was no fire in the room while I was there. I was drunk. I get drunk at times. I have been confined in the guard-house often. I like the city of Asheville, but did not like Aston, the mayor at that time. I have paid several fines."
C. A. Nichols was introduced by plaintiff and sworn:
"I saw plaintiff next morning. His face was blue. He was very cold, and was suffering. I asked the policeman to let him out; told him I would go on his bond for his appearance at trial. Policeman said he couldn't do it until the mayor came. He was confined in cage in upper story. I saw no fire; no evidence of fire; was nothing but old blanket. It was very cold morning. Plaintiff was unwell almost all the time for six or eight weeks thereafter; had a very bad spell of fever."
Cross-examined. — "Moffitt was drunk. He gets drunk at times."
Dr. J. A. Reagan was introduced for the plaintiff and sworn — (witness admitted to be medical expert by defendant):
"I attended Moffitt on 10 January. On 4 February saw him. He was very sick; mind deranged. Had fever that assumed typhoid form. Saw him several times. He was very dangerously ill from 4th to 20th of February. Cold or dampness is the most frequent cause of (242) catarrhal fever. I could not tell what caused this particular sickness."
Question: "If the jury find the facts as testified to, might they produce this disease?"
Objection by defendant. Overruled.
Answer: "They might."
Exception by defendant.
Cross-examined. — "Plaintiff is perfectly sound now, so far as I know. Intemperance in rioting and drinking would not produce this fever; the exposure might. A man drunk, with coat off, would require some time to contract cold. I told plaintiff, when I saw him in January, to go to bed, and that his condition required it to avoid fever, but he did not. There was, about that time, one case of same fever in neighborhood of plaintiff besides his, brought on by exposure. On 10 January plaintiff had pains in his head, shoulders, etc."
Plaintiff introduced several other witnesses, whose testimony tended to corroborate that of plaintiff and the other witnesses whose testimony is above set out. *Page 195 
The defendant offered the following testimony:
Captain F. N. Waddell, a witness for the defendant, testified:
"I am chief of police of the city of Asheville, and have been since 1885. I remember the night of the arrest. I arrested Bell. There was a fire kept in the police department in the prison. That night the stove was at white heat. I directed the policemen to keep up a good fire. The windows were fully glazed on the outside and sealed up with inch plank closely on the inside; no lights were out. The fire was burning well at nine o'clock p. m., and the room was warm next morning where plaintiff was confined. The building is of brick. The cage in which plaintiff was confined was in the third story and south end of said building. There are three walls between it and the northern wall. There was a drum in the room in which plaintiff was kept. The cage was close to the western wall, and the drum between it and the wall. The (243) drum was connected by a pipe with the stove in the police headquarters. This headquarters was the room immediately beneath said cell, and is about twenty feet in height from floor to ceiling. There was plenty of coal on hand that night, and the night force of police, three officers, had no other fire with which to warm themselves but that in this stove. The heating apparatus had been in the cage-room, and the only method of heating it since I have been an officer of the city, and had always proved amply sufficient for that purpose. I had often been in the cell on very cold days and always found it comfortably warm. I had never heard any complaint from persons confined in there, that the heat was not sufficient for comfort, and no one made any complaint on the morning that the plaintiff was there, or at any other time to me or in my hearing, about it. On that morning I was there at eight o'clock, and the fire was burning well. I always saw to it that the room of cage was kept close, the cage well supplied with blankets, a plaintiff supply of coal was on hand, and always, when there, kept good fires, and charged the policemen to do so when I was absent. The stove did not burn wood, but coal. I left about ten o'clock on the night of plaintiff's confinement, and there was a good fire then. There were twelve or fourteen blankets in the cage-room that night, just in front of the cage-door. I saw plaintiff next morning when brought into court, and could not see that he was suffering from cold; he did not appear numb and made no complaints whatever."
Cross-examined. — "I was inside of the cage-room and cage early that morning and it was comfortable. Captain Price, Mr. Adams and Mr. Hunter were there on the night force."
C. J. Harkins, a witness for defendant, testified:
"I was a policeman in January, 1887, in Asheville. The (244) guard-house was in good condition. There was a stove below on the *Page 196 
next floor, and a drum was in the cell-room in which plaintiff was, between the cage and wall. We generally kept blankets up there. Sometimes drunken men would tear them up. There were plenty of blankets there that night. There were no lights out of the windows, and they were ceiled up on the inside with inch plank. The room was of ordinary size. I never heard any complaint of the heating apparatus. Had been policeman several years at that time. Heard no complaint from plaintiff when he came out and went before the mayor. The policemen of the night force had no other place to warm themselves than by the stove in the police headquarters, which heated the drum. I always found that the drum worked well, and when I was on the night force we always kept a good fire. On that night there was a good fire in the stove when I left at nine o'clock. It was warm next morning when I went on at about eight o'clock, in the room where the stove was, and there was a good fire in the stove."
William Adams, a witness for defendant, testified:
"I was a policeman of the city of Asheville in January, 1887, and had been for several years. I arrested the plaintiff between five and six o'clock in the evening. He was drunk and had struck a boy in the barroom. The jail was in a good condition. The windows of the third floor, where the plaintiff was confined, were closely planked up. I did not notice glass from outside particularly, but had any been out I think I should have observed it, and I did not see any out. There was a pile of blankets, about seven or eight, on a chair in the cage, in front of the door, when I put the plaintiff in. The drum made the cage and cage-room comfortable. I was often in there on cold days and it was always comfortably warm. There was a good fire at nine o'clock that night when I left, and a good fire when I returned next morning. I (245) took plaintiff out and heard no complaint. The room was then comfortable, and so was cage. I was present at the trial before the mayor and could not see that plaintiff was suffering any. He made no complaint. I never heard any complaint of the heating apparatus in the cell-room. There was plenty of coal in the room below the cell, where the police headquarters were, and the stove there, which heated the drum in the room above, was the only place where the night-watch could keep warm throughout the night. Our orders were to keep a good fire there, and it was always done when I was on night force."
Capt. T. Price, witness for defendant, testified:
"I was a policeman of the city of Asheville in January, 1887, and had been for several years. I was on duty the night when plaintiff was in prison. There was a good hot fire in the police headquarters all night, and the drum heated well the room above. There was plenty of coal *Page 197 
there, and the stove burned coal. The windows in the room above were ceiled up with plank. If any glass were out of the windows outside this ceiling, I did not notice it, and I am confident that I should have done so had such been the case. No one complained in my hearing of a lack of fire, and from the police headquarters below I would have heard easily any complaint. Never heard any complaint of heating apparatus, which was same during my connection with force. My own observation in the cage and cage-room was, that it was ample, and I often was in there in all sorts of weather. Had there been a lack of sufficient blankets I should have known it, and I knew of nothing of the sort. The cage-room was twice the size of the police headquarters. There was no other place, for night police to keep warm, but the stove that heated the drum. We always kept a good fire in cold weather. Am not now connected with city."
Thomas Hunter, witness for defendant, testified:
"I was a policeman of the city of Asheville in January, 1887, (246) and had been for more than a year. I was on the night force, and on duty the night of plaintiff's confinement. It was our duty to keep up the fires, and we always did when the weather was cold. We had a good supply of coal on hand that night, and kept a good fire all night. There was no complaint from anybody. We had no other way of keeping warm ourselves but by the stove in the police headquarters, which heated the drum above. I was in the cage and cage-room every half hour that night, and the cage and cage-room were always warm. The drum was sufficient to heat them, and did heat them that night; no one would suffer there. There were plenty of blankets in the cage where plaintiff could get them. The windows were fully glazed and ceiled up inside with plank. There were no complaint that night or next morning, and I never heard any complaint of the heating apparatus, which was the same during my connection with the force. I am not now connected with the city government. There was no such conversation as that related by George Bell. He made no complaint to me or request of me, nor to any of us."
C. A. Smith, a witness for defendant, testified:
"I am a policeman of the city of Asheville, and was such in January, 1887. I was on duty the night of plaintiff's confinement; was in and out all night; came in every half hour during night. The stove was pretty much red-hot all night. The drum always heated well the cage and cage-room; never heard any complaint of it. We had plenty of coal on hand; stove burns coal. Bell had no conversation with me, or in my hearing, nor did plaintiff. Neither complained in my hearing. There were plenty of blankets in cage — five or six or seven of them. These windows *Page 198 
of prison room were glazed without and closely planked up within. No one offered to buy wood or complained of cold. The stove was the only place where we could warm ourselves."
(247) Cross-examined. — "I saw blankets in the cage that evening and the next morning. It was a pretty cold night. The cage-room was comfortable next morning. I went in there."
Jonathan Nowell, a witness for defendant, testified:
"I am in charge of city prison, and feed and attend to wants of prisoners. Had my same place in January, 1887, and had had it for several years. The prison was formerly the county jail of Buncombe County, until about two years before that time, the county authorities built another jail and sold this one to the city of Asheville. For four or five years before this sale, I had held the same position for the county that I now hold for the city, namely, to feed and wait upon the prisoners. During the entire time of my connection with this prison, both for county and city, the apparatus for heating this cage and cage-room was the same. I never at any time heard any complaint whatever that it did not warm the room and cage comfortably. I left at seven o'clock. there was a good fire there then, and plenty of blankets in the cage, immediately in front of the door and within a few feet of the prisoners, in easy reach. When I returned next morning at five o'clock, I was in cage. It was comfortable in there then and there was a good fire below. The window-lights were all in and the windows closely planked up with inch plank on the inside. This had been done during the preceding fall. There was a pile of blankets in the cage several feet high. No one complained in my hearing. The plaintiff showed no signs of could when before the mayor, and made no complaint. The officers had no place to warm except by the stove which heated the drum. The drum always kept the cage and cage-room warm. I was in there frequently every day. If any one but me and police were in room except prisoners, I do not know it, but would have known it."
Cross-examined. — "The weather was very cold that night. When I opened the cage-room next morning I felt the warm air rush out. (248) It was warm in there."
H. S. Harkins, witness for defendant, testified:
"I am now mayor of the city of Asheville, but was not in January, 1887. I remember the evening of plaintiff's arrest. I went into a barroom to see the proprietor on some business. It was a very cold day. Plaintiff was in there with his coat off, much affected with liquor. There had been a fire, but it had gone down. A boy was renewing it when plaintiff, from behind, without any provocation, or a word with the boy, struck him a severe blow, and was about to repeat the blow, when I interfered and prevented it. Plaintiff was then arrested. I was for more *Page 199 
than a year chief of police of the city. This was before. I never heard any complaint of the stove and the drum being insufficient to heat comfortably the cage and cage-room. I know that it did heat them very well. I know the general characters of C. J. Harkins, William Adams, F. N. Waddell, Capt. Thomas Price, Thomas Hunter, C. A. Smith, Jonathan Nowell, and they are good."
E. J. Aston, a witness for defendant, testified:
"I was mayor of Asheville in January, 1887, and had been for about three years. I remember the day of plaintiff's confinement. I tried him. He made no complaint to me of suffering. I heard of no complaint. I saw no sign of suffering. The heating apparatus of the cage and cage-room had always proved sufficient. It was there when the city bought jail, and remained there during my terms of office. I was often in cage in all kinds of weather, and always found it comfortable. I was always particularly attentive to the prison, and gave repeated instructions to police to keep it comfortable, explaining that men were put in there only for safe-keeping, and should be carefully attended and provided with comforts. I never heard any complaint from anybody, that these instructions had been neglected in the least particular. There was a plentiful supply of coal, the only fuel used, on hand (249) at the time mentioned, and the windows were closely ceiled up on the inside. I had had them thoroughly glazed and so ceiled up the preceding fall. I do not know that any of the glass were out at this time, but had there been I am confident that I should have observed it, since I was there frequently every day and could easily have seen it. There were plenty of blankets on hand at the time, most of them recently purchased."
Dr. W. D. Hilliard, a witness for defendant, testified:
"I am a physician; graduate of medical college; was for some years assistant physician in Morganton lunatic asylum, and have practiced in Asheville for six years. Consider myself competent to give an opinion on catarrhal fever. A drunk man is more likely to take it than a sober man. Excess in eating or drinking may, with slight exposure, produce it. If the jury should find that the plaintiff was drinking heavily, was in and out of a bar-room on a very cold day, and part of the time in the room when the fire was very low, with his coat off, think this much more likely to have produced catarrhal fever than confinement in prison over night, even if very cold. If the jury should find that the plaintiff, kept in a cold room in prison over night, on a very cold night, and suffered greatly from cold, I think, had this resulted in such fever, it must have reached a full development within a week, at the greatest, thereafter, and that if plaintiff was not confined to his bed for three weeks or more thereafter, it must, in all probability, have been from some other cause *Page 200 
than the confinement, and could not, in my opinion, have been produced by the confinement at a time so long anterior. Many times a very slight exposure will produce catarrhal fever, and it is often impossible to trace the cause."
This was all the evidence in the case.
The defendant asked his Honor to charge the jury, as follows:
"1. That before the plaintiff can recover in this action he must (250) allege and prove that he sustained an injury whereof the proximate cause was the negligence of the city defendant, or its authorities, and it has not been alleged, and there is no evidence that such negligence existed or was such proximate cause.
"2. If the jury shall find that the plaintiff contributed in any manner to his own injury, if any injury he sustained, either by drunkenness and walking in open air on a very cold night without his coat or by declining to obey the advice of his physician and go to bed, or in any other manner which the testimony may show, then he is not entitled to recover.
"3. The defendant was bound to use only ordinary care under the circumstances, and there is no evidence showing or tending to show any want of ordinary care on its part. If, therefore, the jury should find that the plaintiff was injured by the window-panes being out in the prison, they must, in order to render the defendant liable, show that this fact was known to the city authorities, or that the windows had been out for such a length of time as they would ordinarily have known it; and of these things there is no evidence. If the jury shall find that there was no coal or other fuel wherewith to build a fire sufficient, or that the fire built was insufficient to warm the room, or that the machinery provided for warming the room was insufficient for that purpose, they must further find, in order to render the defendant liable, that these things were known to the city authorities a sufficiently long time beforehand to enable them to remedy the same; and of this there is no evidence. If the defendant supplied in the cell, where it is alleged the plaintiff was confined, blankets in sufficient numbers to provide for plaintiff under circumstances which might reasonably have been anticipated, the plaintiff would not be entitled to recover.
(251) "4. The plaintiff must satisfy the jury by a preponderance of evidence, at least, that the injury he sustained, if any, was the proximate result of the negligence of the defendant, and if the jury shall be of opinion that such injury was brought about, even in part, by the negligent acts of the plaintiff, whether in going about without his coat in cold weather, or otherwise, the plaintiff would not be entitled to recover, but in order to such recovery the jury must be satisfied by a preponderance of the evidence that the exposure of the plaintiff in the prison, and without his fault, was the sole cause of his injury, not in any *Page 201 
way aided by anything else wherein the plaintiff failed to exercise ordinary care. The plaintiff must be without fault in that regard, and take such care of himself as a man of ordinary prudence would, in order to entitle him to recover. The city can be liable to plaintiff in no event except for its own negligence. It cannot be liable for the tortious negligence of its police officers.
"5. If the plaintiff sustained an injury, by reason of the failure of the defendant to anticipate and provide against and extraordinary cold night, he cannot recover therefor. Before the plaintiff can recover for an injury, he must show by a preponderance of evidence that the injury was the ordinary, or probable, consequence of the act complained of.
"6. If the plaintiff might have avoided the consequence of the act of defendant, if such act existed, by the exercise of ordinary care, he cannot recover.
"7. If a wrong and resulting damage are not known by common experience to be naturally and usually in sequence, and the damage does not, according to the ordinary course of events, follow from the wrong, then the wrong and the damage are not sufficiently conjoined or concatenated, as cause and effect, to support an action. It is not only requisite that the damage, actual or inferential, should be suffered, but this damage must be the legitimate consequence of the thing amiss. If an injury has resulted in consequence of a certain wrongful act or omission, but only through or by means of some intervening cause, (252) from which the last cause the injury followed as a direct and immediate consequence, the law will refer the damage to the last or proximate cause, and refuse to trace it to that which was more remote."
His Honor refused these prayers for instructions, except as they are embraced in the charge given hereinafter, and the defendant excepted.
His Honor charged the jury as follows:
"The plaintiff must prove, by the preponderance of the evidence, that the injury that he sustained was the immediate and proximate result of the negligence of the defendant. It must appear from the testimony that the imprisonment of the plaintiff by the defendant, and the carelessness or neglect of defendant, or its agents, in providing sufficient bed-clothing or properly heating the prison, or failing to supply the windows with panes, resulted in the injury which plaintiff alleges he has sustained. If there appears to be any cause independent of the conduct of defendant, and intervening between the acts and omissions complained of and the injury, to which the same may be referred and traced, the plaintiff cannot recover. If the injury is the natural and usual result of the act or omission of defendant, and the plaintiff be without fault himself, there may be a recovery. In determining the cause of plaintiff's injury the jury may consider whether the plaintiff exercised prudence and ordinary *Page 202 
care, such as would suggest themselves to prudent and cautious men in the preservation of their health and bodies, and so conducted himself. If the injury may be attributed to the negligence of plaintiff upon the occasion referred to in imbibing intoxicating liquor excessively, and in exposing himself to the inclemency of the weather without suitable or necessary clothing, or if the said injury resulted from his inattention to his person after the imprisonment, the plaintiff cannot recover, except as hereinafter explained. The plaintiff, however, can recover, though (253) he was in fault himself to some extent, if the injury complained of could not have been arrested by the exercise of ordinary care on his part. When the negligence of the defendant is the proximate cause of the injury, and the negligence of the plaintiff is remote, consisting of some act or omission on his part not occurring at the time the injury is such, the plaintiff may recover. It is the duty of the defendant to provide for the comfort of its prisoners in a reasonable manner. It was its duty to furnish everything essential and necessary to accomplish this. These necessities must, of course, conform to the exigencies of the time and season. There must be proper ventilation, sufficient bed-clothing, suitable heating apparatus, operated as occasion may demand. The cell must be protected in such a manner as to prevent the inblowing of cold winds of winter. The prisoner must be treated in a humane manner. If the defendant has neglected its duty in respect to any of these requirements, and injury has been sustained by the plaintiff by reason thereof, he is entitled to be compensated therefor. The defendant would not be required to provide against unforeseen, unusual and extraordinary exigencies, such as might not be reasonably anticipated. If, therefore, the injury of the plaintiff may be attributed to circumstances attending his imprisonment, which could not have been reasonably anticipated and provided for by the defendant, the plaintiff could not recover damage. It was the duty of the plaintiff to conduct himself prudently, and if he did not do so, and failed to exercise ordinary care and prudence, the defendant is entitled to a verdict. If the injury sustained by the plaintiff resulted from the carelessness of the defendant or its officers, and its failure to provide sufficient and suitable means to insure his comfort and safety, then the defendant is responsible, and damages may be awarded to the plaintiff as a compensation, although the illness of the plaintiff may not have resulted from the imprisonment (254) as alleged, still the plaintiff would be entitled to compensation for any sufferings and pains he may have endured during the time of his incarceration by reason of the negligence of the defendant."
To this charge, as given, defendant excepted, and appealed. *Page 203 
The liability of cities and towns for the negligence of their officers or agents, depends upon the nature of the power that the corporation is exercising, when the damage complained of is sustained. A town acts in the dual capacity of an imperium in imperio, exercising governmental duties, and of a private corporation enjoying powers and privileges conferred for its own benefit.
When such municipal corporations are acting (within the purview of their authority) in their ministerial or corporate character in the management of property for their own benefit, or in the exercise of powers, assumed voluntarily for their own advantage, they are impliedly liable for damage caused by the negligence of officers or agents, subject to their control, although they may be engaged in some work that will enure to the general benefit of the municipality. Shearman Redfield on Neg., secs. 123 and 126; Dillon on Mun. Corp., 966 and 968; Thompson on Neg., 734; Meares v.Wilmington, 9 Ired., 73; Wright v. The City of Wilmington, 92 N.C. 156; Wharton Law of Neg., sec. 190; Meyer's Federal Decisions, Vol. 10, sec. 2327. The grading of streets, the cleansing of sewers and keeping in safe condition wharfs, from which the corporation derives a profit, are corporate duties. Whitaker's Smith on Neg., 122; Barnes v. District ofColumbia, 1 Otto, 540-557; Treightman v. Washington, 1 Black., 39; Wharton Law on Neg., sec. 262.
On the other hand, where a city or town in exercising the (255) judicial, discretionary or legislative authority, conferred by its charter, or is discharging a duty, imposed solely for the benefit of the public, it incurs no liability for the negligence of its officers, though acting under color of office, unless some statute (expressly or by necessary implication) subjects the corporation to pecuniary responsibility for such negligence. Hill v. Charlotte, 72 N.C. 55; S. v. Hall, 97 N.C. 474; 2 Dillon Munic. Cor., secs. 965 and 975; Dargan v. Mayor, 31 Ala. 469;City of Richmond v. Long, 17 Grattan, 375; Stewart v. New Orleans,9 La. 461; Wharton Neg., secs. 191 and 260; Hill v. City of Boston,122 Mass. 344; Shearman and Redfield Neg., sec. 129. As illustrations of the principle last stated, it has been held that a city is not answerable in damages for an assault with excessive force, committed by a police officer in the attempt to enforce a city ordinance, or for the negligent or unnecessary killing by a peace officer of a city, of one whom he is attempting rightfully to arrest. Many cases, illustrating by example the principle that municipal corporations are exempt from liability, when acting as agents of the State and exercising governmental *Page 204 
power, will be found collected in Donohue v. City of Brooklyn, 51 Hun., 563 (Albany Law Journal, Vol. 39, No. 17).
The plaintiff was arrested for an assault, committed in the presence of the peace officer of the city, who arrested him, and the officer was unquestionably exercising a right, in fact discharging a duty to the public. The Code, secs. 3808, 3810, 3811 and 3818; Pr. Laws of 1883, ch. 111, sec. 59.
The city of Asheville was not, therefore, answerable in damages to the plaintiff for any violence or negligence, on the part of its officials towards him, up to the moment when he was committed to the city prison.
When we follow the plaintiff across the portal of the prison we are confronted with the new question, whether there is any provision of law creating a liability (expressly or by implication) on the part of (256) the city for the injury to the health of, or for the bodily suffering of, the plaintiff caused by the neglect of the city or its agents in the construction of the prison or the subsequent superintendence of it. Section 6, Article XI, of the Constitution, and section 3464 of The Code, are as follows: Section 6, Constitution, Art. XI: "It shall be required by competent legislation, that the structure and superintendence of the penal institutions of the State, the county jails and city police prisons, secure the health and comfort of the prisoners," etc. The Code, sec. 3464: "The sheriff, or keeper of any jail, shall every day cleanse the room of the prison in which any prisoner shall be confined and cause all filth to be removed therefrom; and shall furnish the prisoner a plenty of good and wholesome water, three times in every day; and shall find each prisoner fuel, one pound of good wholesome bread, one pound of good roasted or boiled flesh, and every necessary attendance."
Section 3465 of The Code imposes upon the county commissioners the duty of purchasing "a number of good warm blankets or other suitable bed-clothes, which shall be securely preserved by the jailer and furnished to the prisoners for their use and comfort, as the season or circumstances may require."
It is not necessary to decide, whether the substitution in The Code of the term "keeper of any jail" instead of "keeper of any public prison" (in sec. 9, ch. 89, Bat. Rev., quoted in Lewis v. Raleigh, 77 N.C. 229), limits the responsibility of towns, or whether Jail, as the generic term, includes every kind of prison, or whether section 3465 of The Code applies to police prisons at all.
The aldermen of Asheville were vested with authority to erect a city prison by section 47, ch. 111, Private Laws 1883, if they did not have the power by implication under the general law in reference to towns; and when they built the police guard-house in the exercise of their power, *Page 205 
the city became as fully amenable for its proper structure and (257) superintendence, as the General Assembly was required by the Constitution to make it answerable by competent legislation.
The defendant, in the discharge of its judicial duties, could not have incurred any liability in any view of the case but for the express provisions of the Constitution and laws. Dillon on Munic. Corp., sec. 975 (773); Hill v. Charlotte, supra.
By a well-known rule, therefore, the law, imposing this responsibility on such municipal corporations for the proper structure and superintendence of their prisons, must be construed strictly.
We hold that the defendant is liable in damages only for a failure, either to so construct its prisons or so provide it with fuel, bed-clothing, heating apparatus, attendance and other things necessary as to secure to the prisoners committed to it a reasonable degree of comfort and protect them from such actual bodily suffering as would injure their health.
If the aldermen of the city built a reasonably comfortable police prison, and afterwards furnished to those who had immediate charge of it everything that was essential to prevent bodily suffering on the part of prisoners from excessive cold or heat or hunger, and to protect their health, the city would not be liable, even if the suffering or sickness of the plaintiff was caused by neglect of the jailer, the policemen, or the attendants to keep the fires burning all night, or to give the plaintiff the necessary bed-clothing furnished to them. Shearman Redfield on Neg., sec. 139 and note (2).
The word superintendence means oversight or inspection, and was intended, as used in the Constitution, to impose upon the governing officials of a municipal corporation the duty of exercising ordinary care in procuring articles essential for the health and comfort of prisoners, and of overlooking their subordinates in immediate control of the prisons (so far, at least, as to replenish the supply of such necessary articles when notified that they are needed), and of employing (258) such agents and raising and appropriating such amounts of money as may be necessary to keep the prison in such condition as to secure the comfort and health of the inmates. Threadgill v. Commissioners, 99 N.C. 352. The rule in reference to the liability of counties for torts is always the same as that which applies to cities and towns when exercising governmental duties. Counties are never answerable in damages for torts, unless made so by the provisions of some statute, either expressly or by necessary implication. Bouditch v. Boston, 4 Stiff., 323; Dillon on Munic. Corp., secs. 963 and 965.
In Threadgill v. Commissioners, supra, Smith, C. J., for this Court, after laying down the rule that a county is required to provide money to *Page 206 
repair public buildings, other than prisons, by the provisions of The Code, sec. 707, subsections 5, 6 and 7, says: "The doctrine is, that while these corporate agencies must provide the means and employ the men to perform such duties, they are not personally and by their own labor to perform such menial service, and the default to make them liable must be in neglecting to exercise their authority in the use of labor and money for that purpose, and so it must be charged to make a cause of action against them." It is true that this language was used in reference to the liability imposed by The Code upon the board of commissioners, as representing the county, for a failure to have the public privies cleaned, and allowing them to become a nuisance.
But the reasoning and the principle apply to the general duty of building and overlooking prisons, imposed by the Constitution upon counties and towns in the very same language, and the statutes (The Code, secs. 3464, 3465) are, if there is any difference, more stringent as to the duty of county commissioners and county jailers in providing and caring for prisoners in the county jails, than they are towards town authorities and keepers of police prisons.
(259) However the general question of the liability of counties, by virtue of this legislation, may hereafter be settled, we may safely say that neither counties nor towns can be required, as a general rule, to answer in damages for injuries to prisoners caused by the neglect of their respective jailers, policemen or guards who may have immediate charge and custody of them, and of which the governing officials of the corporation had no notice.
We think that where window-glass in the window of a police prison has been broken and the bed-clothing furnished for its inmates has been destroyed, but the governing officers of the town are not shown to have had actual notice of the breaking or destruction, or to have been negligent in omitting to provide for such oversight of the prison as would naturally be expected to give them timely information of its condition, there is not such a failure in discharging the duties of construction or superintendence as to subject the corporation to liability. We do not wish, however, to be understood as intimating that a city or town would not be liable, if it should retain incompetent or careless jailers or servants after notice of their character, for damages caused by their negligence, though the question is not directly presented in this case.
It naturally follows, from giving our sanction to the principles already stated, that we should hold that the judge below erred in refusing to give the third instruction asked, and in telling the jury in lieu of the charge asked: first, "It must appear from the testimony that the imprisonment of the plaintiff by the defendant and the carelessness or neglect of the defendant, or its agents, in providing sufficient bed-clothing, *Page 207 
or properly heating the prison, or failing to supply the windows with panes, resulted in the injury which plaintiff alleges he had sustained." Second: "If the injury sustained by the plaintiff resulted from the carelessness of the defendant, or its officers, and its (260) failure to provide sufficient and suitable means to insure his comfort and safety, then the defendant is responsible, and damages may be awarded to the plaintiff as compensation," etc.
Acting under the instructions given, it may be that the jury believed from the evidence that the sickness and suffering of the plaintiff was caused by the failure of the keeper of the prison to make a fire in a stove, though he had an abundance of fuel provided by the proper authorities of the city. The case of Lewis v. City of Raleigh, supra, was one in which the plaintiff was arrested for a violation of a city ordinance, which is made, by section 3820 of The Code, a criminal offense, and therefore it is very similar to this. But it is distinguishable in that the plaintiff Lewis was confined in a narrow cell, 8x14, located in a cellar under the market-house, with no window and no ventilation except a grate in the door that opened on an underground passage, with a window at one end lighted through a grate on the sidewalk. Reviewing the admitted facts, Justice Reade, for the Court said: "It was an impossibility that such a place could `secure health and comfort,' in the language of the Constitution, or that it could be `clean,' in the language of the statute." On the trial below there was a great deal of testimony tending to show that the prison of the defendant was well constructed for health and comfort, and was provided with bed-clothing, fuel, stoves and everything necessary to secure a reasonable degree of comfort and protect health. Counsel on the argument cited Bunch v. Edenton,90 N.C. 431, in support of the contention that the evidence established the accountability of the defendant. The plaintiff there brought his action to recover damages for an injury caused by his falling into an excavation near the sidewalk in the town of Edenton. Justice Merrimon, in delivering the opinion of the Court, adverted to the distinction we have drawn between the corporate and governmental powers of a town, and cited Lewis v. Raleigh, supra, and Hill v. Charlotte,supra. The law required that the commissioners "shall provide (261) for keeping in proper repair the streets and bridges in the town." The Code, sec. 3803. The Court, construing the law, said: "And proper repair implies also that all bridges, dangerous pits, embankments, dangerous walls, and the like perilous places and things very near, shall be guarded against by proper railings and barriers."
It is not necessary that we should pass upon the exception to the evidence of Dr. Reagan, who testified as an expert, yet we would suggest a *Page 208 
careful examination of the rule laid down in S. v. Bowman, 78 N.C. 509, in framing questions for the witness in any future trial.
For the error pointed out in the charge to the jury, the defendant is entitled to a new trial.
Error. Venire de novo.
Cited: Tate v. Greensboro, 114 N.C. 416; Love v. Raleigh, 116 N.C. 305;Shields v. Durham, ibid., 407; Rosenbaum v. New Bern, 118 N.C. 98;Willis v. New Bern, ibid., 137; Shields v. Durham, ibid., 455; Coley v.Statesville, 121 N.C. 316; Pritchard v. Commissioners, 126 N.C. 912;Bell v. Commissioners, 127 N.C. 91; McIlhenny v. Wilmington, ibid., 149;Moody v. State Prison, 128 N.C. 16; Levin v. Burlington, 129 N.C. 188;Peterson v. Wilmington, 130 N.C. 77; Bank v. Commissioners, 135 N.C. 247;Fisher v. New Bern, 140 N.C. 510; Hull v. Roxboro, 142 N.C. 460;Metz v. Asheville, 150 N.C. 749; Graded School v. McDowell, 157 N.C. 319;Harrington v. Greenville, 159 N.C. 634; Hines v. Rocky Mount, 162 N.C. 412;Nichols v. Town of Fountain, 165 N.C. 169; Snider v. High Point,168 N.C. 610; Price v. Trustees, 172 N.C. 85; Howland v. Asheville,174 N.C. 751; Mack v. Charlotte, 181 N.C. 385; James v. Charlotte,183 N.C. 631; Sandlin v. Wilmington, 185 N.C. 260; Scales v. Winston-Salem,189 N.C. 470; Ghorley v. R. R., ibid., 634; Henderson v. Wilmington,191 N.C. 278; S. c., ibid., 289; Grocery Co. v. Vernon, 192 N.C. 821;Parks-Belk Co. v. Concord, 194 N.C. 135.