IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-833

Filed 16 July 2025

Scotland County, No. 23CVS000334-820

TEQUILLA SMITH, Adm. of the
Estate of TYREK SMITH, Deceased, Plaintiff,

v.

SCOTLAND COUNTY AND WAGRAM
RECREATION CENTER, Defendants.

Appeal by plaintiff from order entered 14 July 2024 by Judge Dawn M. Layton in Scotland County Superior Court. Heard in the Court of Appeals 25 February 2025.

*Coy E. Brewer, Jr., for plaintiff.*

*The Rogers Law Firm, PLLC, by Allen W. Rogers, for plaintiff.*

*Teague, Campbell, Dennis, & Gorham, LLP, by Jacob H. Wellman, for defendant.*

FREEMAN, Judge.

Plaintiff appeals from an order granting defendant's motion for summary judgment on her claim that the decedent died as a result of defendant's negligence. On appeal, plaintiff argues that the trial court erred by granting defendant's motion for summary judgment on the basis that defendant was entitled to governmental immunity. After careful review, we affirm the trial court's order.

## I.  Factual and Procedural Background

Defendant owns and operates the Wagram Recreation Center ("Wagram Center") as part of its parks and recreation programs.[1] Wagram Center consists of a gymnasium with a full-sized basketball court, a fitness room, and office and community spaces. In June 2021, Wagram Center was equipped with an air conditioning system. However, there was no air conditioning system in the gymnasium, which was equipped with ventilation fans.

Defendant offered yearly memberships to use the Wagram Center gymnasium and fitness room. Membership rates for residents of Scotland County ranged from $4.00 per day to $325.00 per year "for family members [i]n one household." Fees for out-of-county residents ranged from $7.00 per day to $500 per year for a family. In 2020, defendant spent $118,207.73 operating Wagram Center and earned $12,016.87 from all of Wagram Center's recreation programs. In 2021, defendant spent $129,045.85 on Wagram Center's operations and earned $6,000.73 in revenue.

Defendant also offered recreation programs that did not require participants to purchase a Wagram Center membership. One of these was Adult Free Play basketball, which was held in the gymnasium. To participate in the Adult Free Play program, a participant "had to be a certain age, they had to have a physical photo ID,

---

[1] Plaintiff named Scotland County and Wagram Recreation Center as separate defendants in her complaint. Scotland County denied that Wagram Center was an entity capable of suing and being sued. As litigation continued, neither party argued that Wagram Center was an entity separate from Scotland County, and it is not treated as a separate defendant on appeal by either party. Accordingly, there was a final judgment with respect to the only defendant in the action, Scotland County.

. . . they would have to sign a waiver, and it was a charge of $2[.00]. If they didn't have the $2[.00], then [defendant] would waive it."

The decedent, twenty-four-year-old Tyrek Smith, often played Adult Free Play basketball and had signed a liability waiver to do so in November 2020. On 10 June 2021, Smith worked the third shift, 11:45 p.m. to 7:45 a.m., at a Purdue chicken processing plant. After work on 11 June, Smith went to Wagram Center for Adult Free Play basketball around 11:45 a.m. That day, the Adult Free Play session was scheduled for 11:00 a.m. to 2:00 p.m. There was no air conditioning in the gymnasium during this session.

Smith started playing a pickup game of basketball with a few friends just after 11:45 am. Around 12:45 p.m., Smith laid down on the bleachers, as "it was his turn to sit down and wait[.]" Shortly after, one of his friends checked on Smith and "tried to get [Smith] to drink but he wouldn't." Thirty minutes later, Smith sat up "slumped over." At some point after Smith sat down, he called his mother to tell her that he was coming home. Around 1:47 p.m., Smith fell to the floor. One of the free play participants went into the lobby and told the recreation assistant, "Somebody needs to call 911, somebody had passed out." When the paramedics arrived around 2:00 p.m., they found Smith unconscious. Smith subsequently passed away. He died of hyperthermia, meaning his body temperature was greatly above normal. In November 2021, defendant installed an air conditioning system in the gymnasium.

On 1 June 2023, plaintiff, in her capacity as the personal representative of

Smith's estate, sued defendant, alleging that Smith's death was caused by defendant's negligent operation and supervision of the gymnasium. On 22 July 2024, defendant moved for summary judgment, arguing that (1) it was entitled to governmental immunity; (2) Smith signed a liability waiver; (3) there was no evidence that it acted negligently to cause Smith's death; and (4) if it were negligent, then Smith was contributorily negligent. On 12 August 2024, the trial court granted defendant's motion, concluding that there were "no genuine issues of material fact, and that [defendant] is entitled to judgment as a matter of law on the issue of governmental immunity." Plaintiff timely appealed.

## II.    Jurisdiction

"[A]ppeal lies of right directly to the Court of Appeals . . . [f]rom any final judgment of a superior court[.]" N.C.G.S. § 7A-27(b)(1) (2023). Accordingly, we have jurisdiction to review plaintiff's appeal.

## III.    Standard of Review

"The standard of review for a trial court's ruling on a motion for summary judgment is de novo." *Horne v. Town of Blowing Rock*, 223 N.C. App. 26, 32 (2012) (cleaned up).

## IV.    Discussion

Plaintiff argues that the trial court erred by granting defendant's motion for summary judgment because defendant "operated Wagram Recreation Center in a proprietary capacity," so defendant did "not qualify for . . . governmental immunity[.]"

Summary judgment "shall be rendered . . . if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2023). "All facts asserted by the adverse party are taken as true and their inferences must be viewed in the light most favorable to that party[.]" *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (cleaned up).

> The showing required for summary judgment may be accomplished by proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of her claim[.]

*Id.* (cleaned up).

"Under the doctrine of governmental immunity, a county is immune from suit for the negligence of its employees in the exercise of governmental functions absent a waiver of immunity." *Evans v. Hous. Auth. of City of Raleigh*, 359 N.C. 50, 53 (2004) (citation omitted). In other words, "[g]overnmental immunity does not . . . apply when the municipality engages in a proprietary function." *Estate of Williams ex rel. Overton v. Pasquotank Cnty. Parks & Recreation Dept.*, 366 N.C. 195, 199 (2012) (citation omitted).

A governmental function is one "which is discretionary, political, legislative, or public in nature and performed for the public good [o]n behalf of the State rather than

for itself[.]" *Britt v. City of Wilmington*, 236 N.C. 446, 450 (1952). Generally, "[w]hen a municipality is acting [o]n behalf of the State in promoting or protecting the health, safety, security or general welfare of its citizens, it is an agency of the sovereign." *Id.* (cleaned up). However, when a municipality "engages in a public enterprise essentially for the benefit of the compact community, it is acting within its proprietary powers." *Id.* at 451.

"In determining whether an entity is entitled to governmental immunity, the result therefore turns on whether the alleged tortious conduct of the county or municipality arose from an activity that was governmental or proprietary in nature." *Estate of Williams*, 366 N.C. at 199. Our Courts have applied a three-step analysis to determine whether an activity is governmental or proprietary in nature stating:

> First, a court must consider whether the legislature has designated the activity as governmental or proprietary. Second, when an activity has not been designated as governmental or proprietary by the legislature, that activity is necessarily governmental in nature when it can only be provided by a government agency or instrumentality. Finally, when the particular service can be performed both privately and publicly, the inquiry involves consideration of a number of additional factors, of which no single factor is dispositive. Relevant to this inquiry is whether the service is traditionally a service provided by a governmental entity, whether a substantial fee is charged for the service provided, and whether that fee does more than simply cover the operating costs of the service provider.

*Bynum v. Wilson Cnty.*, 367 N.C. 355, 358–59 (2014) (citing *Estate of Williams*, 366 N.C. at 200–03 (2012) (cleaned up)). Thus, "[w]hen the legislature has not directly

resolved whether a specific activity is governmental or proprietary in nature, other factors are relevant." *Estate of Williams*, 366 N.C. at 202.

We address each factor in turn.

## A. Legislative Designation

We first examine the "threshold inquiry": "whether, and to what degree, the legislature has addressed the issue." *Meinck v. City of Gastonia*, 371 N.C. 497, 503 (2018) (citation omitted). "The creation and operation of public . . . recreation programs are legitimate and traditional functions of the government." *Hickman ex rel. Womble v. Fuqua*, 108 N.C. App. 80, 84 (1992) (cleaned up). Our General Assembly has declared that:

> [T]he public good and the general welfare of the citizens of this State require adequate recreation programs, that the creation, establishment, and operation of parks and recreation programs is a proper governmental function, and that it is the policy of North Carolina to forever encourage, foster, and provide these facilities and programs for all its citizens.

N.C.G.S. § 160A-351 (2023); *see also id.* § 160A-353(4) (2023) ("each county . . . in this State shall have the authority to . . . [p]rovide, acquire, construct, equip, operate, and maintain . . . recreation centers, and recreation facilities[.]"). " 'Recreation' means activities that are diversionary in character and aid in promoting entertainment, pleasure, relaxation, instruction, and other physical, mental, and cultural development and leisure time experiences." *Id.* § 160A-352 (2023).

However, "not every nuanced action that could occur in a park or other

recreation facility has been designated as governmental or proprietary in nature by the legislature." *Estate of Williams*, 366 N.C. at 202. Accordingly, we must determine whether the "nuanced activity" here has been designated as governmental by the legislature.

Plaintiff argues that we should take a broad view of the "nuanced activities," and asserts that they are: "operating a gymnasium; charging fees for the use of the gymnasium, including 'free play' activities; charging membership rates for its fitness room." Defendant, on the other hand, maintains that we should only "look at the nuanced activity in which Mr. Smith was actually participating at the time of the incident to determine whether [defendant's] operation of [Wagram Center] was governmental in nature."

Binding precedent supports that we view the "nuanced activity" narrowly. *See Moffit v. City of Asheville*, 9 S.E. 695, 697 (N.C. 1889) ("The liability of cities and towns for the negligence of their officers or agents depends upon the nature of the power that the corporation is exercising *when the damage complained of is sustained*." (emphasis added)). For example, in *Estate of Williams*, the defendant-county's alleged tortious conduct occurred in a swimming area of a public park, and the swimming area could be rented out for private purposes. 366 N.C. at 196–97. Our Supreme Court only examined the defendant-county's maintenance and operation of that specific portion of the park, not the county's operation of the park as a whole. *Id.* at 201. Further, the plaintiff's complaint specifically identified the county's operation

of the swimming area as the alleged tortious conduct. *Id.* at 196–97.

Here, plaintiff alleged in her complaint that defendant was negligent in "its operation, maintenance, supervision, and control of the Wagram Recreation Center, particularly in relationship to property upon which Tyrek Smith was harmed, injured, and died." Plaintiff specifically alleged that the cause of Smith's death was the lack of air conditioning in the gymnasium where Adult Free Play basketball took place. Additionally, there is no evidence in the record before us that Smith participated in any of the other recreation programs offered at Wagram Center. Because the alleged tortious conduct was defendant's operation of the Adult Free Play basketball program, which included operating the gymnasium where Adult Free Play basketball took place, we focus our analysis on that "nuanced activity" and not defendant's operation of Wagram Center as a whole.

Offering access to an indoor gymnasium for adults to play pick-up basketball is an activity that fosters entertainment and physical development, so Adult Free Play basketball may be a recreation program that the legislature has declared as a proper governmental activity. *See, e.g.*, *Hickman*, 108 N.C. App. at 84 ("[W]e hold that when a municipality provides free sports instruction . . . , it is acting in a governmental capacity. Our holding is made even clearer in light of the General Assembly's pronouncement on the general subject [in N.C.G.S. § 160A-351]."). However, considering that the legislature has not expressly designated this activity

as a governmental function, we will address the remaining factors.[2]

## B. Governmental Exclusivity

We next examine whether the nuanced activity, Adult Free Play basketball, could "only be provided by a government agency or instrumentality." *Bynum*, 367 N.C. at 359 (citation omitted). If so, then the "activity is necessarily governmental[.]" *Id.* (citation omitted). Operating a gymnasium for pick-up basketball is not exclusively reserved for the government; it could be done by a public or private entity. Therefore, this factor is not dispositive of whether offering Adult Free Play basketball is a governmental function. But given that the distinction between exclusively governmental activities and activities that can be performed by public or private entities "lacks the utility it once had[,]" *Estate of Williams*, 366 N.C. at 204, as "it is increasingly difficult to identify services that can only be rendered by a governmental entity[,]" *id.* at 202, this factor has little weight in our analysis.

## C. Other Factors

Finally, we examine "a number of additional factors," such as "whether the

---

[2] Continuing this analysis is consistent with precedent. For example, our Supreme Court acknowledged that the defendant-city's activity, leasing buildings it owned in its downtown area to local artists, was authorized by the Urban Redevelopment Law, N.C.G.S. §§ 160A-500 to -526 (2017), and the Municipal Service District Act, N.C.G.S. §§ 160A-535 to -544 (2017). *Meinck*, 371 N.C. at 504–14 ("We conclude that these provisions of the Urban Redevelopment Law and the Municipal Service District Act are statutory indications that an urban redevelopment project undertaken in accordance with these statutes for the purpose of promoting the health, safety, and welfare of the inhabitants of the State of North Carolina is a governmental function." (cleaned up)). However, recognizing that a general activity being declared as governmental does not mean that the "specific activity at issue, in this case and under these circumstances, is a governmental function[,]" the Supreme Court addressed the two remaining factors. *Id.* at 513–14 (cleaned up).

service is traditionally provided by a governmental entity, whether a substantial fee is charged for the service provided, and whether that fee does more than simply cover the operating costs of the service provider." *Bynum*, 367 N.C. at 359.

### 1. *Traditionally Provided by a Governmental Entity*

As discussed above, providing recreation programs for physical activity is traditionally a function of the government. *E.g.*, *Hickman*, 108 N.C. App. at 84 (holding that the defendant-county offering free tennis instruction for children was a traditional government function). Thus, this factor weighs in favor of Adult Free Play basketball being a governmental activity.

### 2. *Substantial Fee*

Whether a substantial fee is charged can indicate whether an activity was done for pecuniary gain. But the mere charging of a fee does not conclusively identify an undertaking as proprietary. Indeed, we have rejected the idea that "one of the major tests in labeling a government activity proprietary is whether a monetary fee is involved." *McIver v. Smith*, 134 N.C. App. 583, 586 (1999). Thus, it is not whether a fee was charged that indicates whether an activity is a governmental function, but whether the fee transforms the activity from one done for the "common good" to one done "for pecuniary profit." *Id.* at 587.

Instructive here is *Willet v. Chatham County Board of Education*, 176 N.C. App. 268 (2006). There, we held that a school board's operation of a basketball team was a governmental function where the "admission fee of $1.00 for students and $2.00

for parents was hardly 'substantial' and there [was] no evidence in the record to show that the basketball admission charges generated enough revenue to pay for anything other than the school's athletic program." *Id.* at 271–72.

Here, defendant charged $2.00 per session of the Adult Free Play basketball program. Given that this Court has held that a $2.00 fee is "hardly substantial," the low amount charged indicates that defendant's operation of this program is a governmental function and not a proprietary one.[3] Moreover, defendant would waive the fee if a participant did not have money to pay for it. This further supports that the primary purpose in operating the program was advancing the common good, not generating revenue.

### 3. Revenue Generated Versus Operating Costs

Finally, we evaluate whether the fee did more than cover the cost of operation, cognizant that an activity still may be deemed proprietary even if the revenue generated falls short of covering operating costs. *See, e.g.*, *Sides v. Cabarrus Mem'l Hosp., Inc.*, 287 N.C. 14, 24 (1975) ("[T]he fact that the operation as a whole is nonprofitable is not determinative as to whether the activity will be classified as

---

[3] In her reply brief, plaintiff asserts that the true cost of Adult Free Play basketball "was more than $2.00—patrons were required to sign a waiver of liability, purportedly signing away their right to be compensated for any injuries that may occur because of [defendant's] operation of the gymnasium." But plaintiff cites no legal authority to support that a signed liability waiver increases the cost of the fee charged, so we consider this argument abandoned. *See Fairfield v. WakeMed*, 261 N.C. App. 569, 575 (2018) ("Plaintiffs do not cite any legal authority in support of this argument as required by the North Carolina Rules of Appellate Procedure. Therefore, we deem this issue to be abandoned.").

proprietary or governmental."); *Glenn v. City of Raleigh*, 246 N.C. 469, 472, 477 (1952) (earning $18,531.14 in net revenue from a public park after spending $25,125.01 on maintenance expenses and $18,870.95 on recreation expenses for the park was a "corporate benefit or pecuniary profit . . . to the [defendant-city] as to exclude the application of governmental immunity.").

For example, in *Koontz v. City of Winston-Salem*, our Supreme Court examined whether the defendant-city was entitled to governmental immunity when it contracted with the county in which the city was located to dispose of its garbage. 280 N.C. 513, 528 (1972). The General Assembly had authorized cities to

> [S]ummarily remove, abate, or remedy . . . everything in the city limits, or within a mile of such limits, which is dangerous or prejudicial to the public health; and the expense of such action shall be paid by the person in default, and, if not paid, shall be a lien upon the land or premises where the trouble arose, and shall be collected as unpaid taxes.

*Id.* (omission in original) (quoting N.C.G.S. § 160-234). Under the contract with the county, however, "licensed private collectors picked up garbage in areas outside of the city limits and delivered it to the city's landfill site." *Id.* The defendant-city "received 9.39% of its cost for the landfill operations[,]" which was "over and beyond incidental income." *Id.* at 529–30. But it was not only the revenue generated that made this activity proprietary:

> By use of the contract, . . . the [defendant-city] could extend its protection against accumulated garbage and refuse for more than one mile from its territorial limits. Also, the

> [defendant-city] avoided the possibility of having to collect the cost of removal of garbage pursuant to the statute; and, further, avoided the very real possibility of litigation to enforce the lien provided by the statute. *Thus, there were advantages under the contract with [the county] which inured to the [defendant-city's] special corporate benefit and thereby brought defendant within the often announced rule that a municipality acts in a proprietary capacity when it receives special corporate benefit or pecuniary profit.*

*Id.* (emphasis added) (cleaned up).[4] Therefore, the defendant-city was not entitled to governmental immunity for this undertaking. *Id.*

On the other hand, in *Meinck v. City of Gastonia*, the defendant-city rented out some of its downtown properties to a local artistic nonprofit to "sublease portions of the building to individual artists . . . to use as studios[.]" 371 N.C. at 498–99.

> [T]he lease set[ ] rental rates for the . . . subtenants in a range of not more than $90.00 to $375.00 per month, of which 90% [was] paid to [the defendant-city]. Furthermore, [the defendant-city] receiv[ed] 15% of all sales or commissions under the lease, and subtenants [were] required to provide additional consideration in the form of volunteer time, with a minimum of fifteen hours per month.

*Id.* at 515. In one fiscal year, the defendant-city earned $21,572.98 from the subleases but spent $33,062.01—netting a loss of $11,489.03, meaning the defendant-city

---

[4] We note the *Koontz* Court also discussed *Glenn v. City of Raleigh*, and stated, as plaintiff asserts here, that "the city received 11.7% of the cost of maintenance of its parks," which was approximately $158,000 for all of the city's parks, but only examined the net revenue of the park where the alleged tortious conduct occurred. 280 N.C. at 527 (citing *Glenn*, 246 N.C. at 472). Since *Koontz*, however, our Supreme Court has instructed that we examine "nuanced activity" in which the municipality is engaged: not the entire recreation or parks program budget. *See Estate of Williams*, 366 N.C. at 202.

earned back about 65% of what it spent on the undertaking. *Id.* The following fiscal year, the net loss was $18,072.86, so it earned approximately 55% of what it spent on the activity that fiscal year. *Id.*

Our Supreme Court concluded these revenues were not " 'substantial,' particularly because such revenues were not even designed to 'simply cover the operating costs of the service provider,' nor did they do so in reality." *Id.* (quoting *Estate of Williams*, 366 N.C. at 202–03). The Court also noted that the activity was of a "decidedly noncommercial nature" because "[a]rt occupies a unique role in our society and our state[.]" *Id.* at 516. Accordingly, the defendant-city was entitled to governmental immunity for that specific activity.

Here, the operation of Wagram Center in its entirety in 2020 netted a loss of $106,190.86, meaning defendant earned back about 10% of what it spent to operate Wagram Center. The following year, Wagram Center netted a loss of $123.045.12, meaning defendant earned back about 4.5% of the operational cost. We do not know precisely how much the fees from the Adult Free Play basketball program contributed to those revenues. Considering the low fee charged for that program compared to the higher fees charged for other activities, like annual memberships, the Adult Free Play basketball program could at best have generated a small fraction of Wagram Center's annual revenue.

Even if we consider the revenue of Wagram Center as a whole, it is well below the proportion of the revenue earned in *Meinck*, which supports a determination that

this is a governmental function. On the other hand, the proportional cost of operating Wagram Center is comparable to the cost of the waste disposal activity in *Koontz*, where our Supreme Court held that the defendant-city engaged in a proprietary activity. But unlike *Koontz*, where the contract gave the defendant-city advantages that it did not have under the statute, defendant here does not partner with another entity to give it such a benefit. Therefore, the total operating loss of Wagram Center indicates that defendant operated Wagram Center for the common good and not for its own pecuniary benefit, which supports the conclusion that defendant was entitled to governmental immunity.

## V.     Conclusion

Defendant' operation of the Adult Free Play basketball program is authorized by the legislature and furthers its aim of offering recreation programs to citizens of this State. The small fee charged, which defendant waived at times, and the significant total operating loss for Wagram Center further demonstrate that defendant's activity was done for the good of the public, not for its own pecuniary gain. Therefore, the trial court did not err by granting defendant's motion for summary judgment on the basis that defendant was entitled to governmental immunity, and we affirm the trial court's summary judgment order.

AFFIRMED.

Chief Judge DILLON and Judge HAMPSON concur.