ANN F. KOONTZ, ADMINISTRATRIX OF THE ESTATE OF DALTON KLUTZ
KOONTZ, DECEASED; ROLAND JEROME GAY; WILLIAM E.
BATTS, III; PATRICIA SUMMIT COLTRANE, ADMINISTRATRIX OF
THE ESTATE OF ROBERT McKINLEY COLTRANE, DECEASED;
JANET BROWN CALHOUN, ADMINISTRATRIX OF THE ESTATE OF
JOEL CALHOUN, JR., DECEASED; HAROLD FRANKLIN DUNE-
VANT; BODO U. J. BEER, STEPHEN SHORE, AND JOHNNY A.
NAYLOR v. CITY OF WINSTON-SALEM

No. 76

(Filed 15 March 1972)

1. Rules of Civil Procedure § 56— summary judgment

A motion for summary judgment should be allowed and judgment
entered when the evidence reveals no genuine issue as to any material
fact and the moving party is entitled to a judgment as a matter of law.

2. Rules of Civil Procedure § 56— summary judgment — genuine and
material issue

An issue is material if the facts alleged would constitute a legal
defense, or would affect the result of the action, or if its resolution
would prevent the party against whom it is resolved from prevailing
in the action; an issue is "genuine" if it may be maintained by sub-
stantial evidence.

3. Rules of Civil Procedure § 56— summary judgment — burden of proof

The party moving for summary judgment has the burden of
clearly establishing the lack of a triable issue, and his papers are
carefully scrutinized and those of the opposing party are indulgently
regarded.

4. Municipal Corporations § 4— powers of a municipality

A municipality has only such powers as the legislature confers
upon it.

5. Municipal Corporations § 21— collection and disposal of garbage —
governmental function — governmental immunity

There can be no recovery for wrongful death or personal injury
against a municipality for negligent acts of omission or commission
by its agents or servants while engaged in the governmental function
of collecting, removing and disposing of garbage within its territorial
limits.

6. Municipal Corporations § 21— landfill operation — disposal of garbage
— governmental function — governmental immunity

A landfill operation by a municipality for the purpose of disposing
of garbage collected within its territorial limits is a governmental
function; consequently, governmental immunity would ordinarily
preclude recovery from the municipality for wrongful death or
personal injuries caused by the negligent acts or omissions of the
municipality's agents or servants in operating the landfill.

7. **Municipal Corporations § 21— city landfill — contract to dispose of county garbage — propriety function — governmental immunity**

A city was engaged in a proprietary function in operating a landfill for the disposal of garbage where the city had contracted with the county to dispose of county garbage for a fee, since (1) the city received "special corporate benefit" by use of the contract rather than the provisions of G.S. 160-234 for protection against accumulated garbage and refuse within a mile of its corporate limits, and (2) the revenues received by the city under its contract with the county amounted to more than incidental income; consequently, the city was not protected by the doctrine of governmental immunity in actions for wrongful death and personal injuries allegedly resulting from an explosion in a National Guard armory of accumulated methane gas which had been generated in and released from the city's landfill operation.

Chief Justice BOBBITT and Justice SHARP concur in result.

ON *certiorari* to the Court of Appeals for hearing prior to determination by that Court.

These civil actions were instituted by the personal representatives of Koontz, Coltrane and Calhoun for damages for wrongful death; and by plaintiffs Gay, Batts, Dunevant, Beer, Shore and Naylor for damages for personal injuries. The respective plaintiffs' intestates and plaintiffs were all severely burned as the result of an explosion in the supply room of the Winston-Salem National Guard Armory on the morning of 27 September 1969. Plaintiffs primarily allege that the injuries and deaths resulted from the tortious acts or omissions of defendant City in its proprietary operation and maintenance of a sanitary landfill on property belonging to the armory.

Defendant by its answer pleaded various affirmative defenses, including the defense of governmental immunity, and served with each answer notice that it would move for summary judgment.

Thereafter, plaintiffs moved to consolidate all the cases for the purpose of discovery, and defendant moved that the discovery be limited to the issue of governmental immunity. On 3 December 1970 Judge Frank Armstrong entered an order consolidating all cases for discovery on the issue of liability, including governmental immunity, and denied defendant's motions to limit discovery to the issue of governmental immunity. The cases came on to be heard on defendant's motions for summary judgment before Judge Harvey A. Lupton at the

3 May 1971 Session of Forsyth Superior Court on two grounds, to wit: (1) that the doctrine of governmental immunity barred any recovery by plaintiffs as a matter of law, and (2) that the complaint failed to state a claim upon which relief can be granted.

The attorneys for all parties, with the court's consent, agreed that the hearing would be limited to the question of governmental immunity, without waiving any party's right to be heard on the other issue if the case was not finally determined on the issue of governmental immunity. Judge Lupton heard the cases on the pleadings, answers to interrogatories, depositions of John M. Gold, Joe H. Berrier, Glenn W. Kilday, and Orville W. Powell, affidavit of Joe H. Berrier, affidavit of Alfred Francis Shaw, and documents and maps produced by defendant at plaintiffs' request.

These documents, in summary, tend to show that between 1913 and 1929 the City acquired all but 0.12 acres of the 83.47 acres of land that finally comprised the landfill site bordering on Silas Creek Parkway. The cost of all this land to the City was $22,019. After its acquisition, the City at various times maintained a sewage treatment plant, an abattoir, a disposal incinerator, and a fire-training tower on the land. Between 1930 and 1949 ashes and other incinerator residue were dumped on the land. In 1949 the City ceased using the incinerator and began disposing of garbage and other solid waste (hereinafter called garbage) by the sanitary landfill method. This method of disposing of garbage involves spreading out the garbage on the surface of a filled area in a layer about six inches thick, covering the garbage with a layer of fill dirt and then packing the dirt over the garbage. This operation is repeated until a desired grade of fill is achieved. The organic content of the garbage decomposes over a period of eight to ten years after the garbage is buried. This decomposition gives off a number of organic gasses, including methane. Methane gas, which is lighter than air, collects in hollowed-out places in the fill or permeates through the porous fill material and escapes into the atmosphere. Decomposition causes the filled area to shift and settle throughout the eight to ten year period. The generation of gas and the settling of the land are natural incidents to a landfill operation.

Defendant, through its agents and officials, knew that methane gas was an incident of a landfill garbage disposal, and

that methane gas had, prior to September 1969, collected on and in areas adjacent to the landfill, causing minor explosions and "flash fires." The City had installed a ventilator fan in a large culvert drainage system passing through the filled area to exhaust gasses collected in the drainage system. The landfill was the only known source of methane gas in the general area of the armory.

Beginning in 1947, the City conveyed several tracts of the land to various grantees. The total amount received for all the conveyances from the landfill property was $255,780. Among these were the following: (1) conveyance to the State of North Carolina, 9.1 acres to be used as an armory, for no consideration; (2) conveyance to Trustees of Forsyth Technical Institute, 6.24 acres, for the consideration of $85,000; and (3) conveyance to Ed Owens in July 1969 of 16.1 acres, for the sum of $162,000. This sale was made after public advertisement.

The City retained certain utility and drainage easements over the lands sold. The City presently retains approximately 38.8 acres of the original tract.

The record reveals that the City had planned to develop the landfill for a recreational area, but later decided to hold it for sale. In this connection, the City purchased dirt to put over the landfill site in order to cover refuse and to obtain better drainage before the land was offered for sale. In his affidavit, which was considered by the court, Mr. Joe Berrier, public works director for the City, stated: "It (landfill) is much more economical than incineration. It is a means by which otherwise undesirable or unuseful land can be made usable."

For several years prior to the explosion complained of by plaintiffs, the City had disposed of garbage at the Silas Creek Parkway landfill which came from outside the city limits. This garbage was collected from densely populated areas adjacent to the City by private collectors licensed by the County. The City disposed of this garbage pursuant to an agreement with Forsyth County. Under the terms of this agreement the City received compensation for this service at the rate of one dollar per ton for garbage delivered to the landfill. The records of the City show that the cost of operating the landfill during this period was approximately one dollar per ton of garbage disposed of at the fill. The City received the following revenues as a

result of this agreement with Forsyth County: Fiscal year 1965-66, $5,604.50; fiscal year 1966-67, $8,111.50; fiscal year 1967-68, $20,249.15; fiscal year 1968-69, $9,265.00; fiscal year 1969-70, $12,130.50.

Plaintiffs contend that the explosion causing the injuries and deaths resulted from a build-up of methane gas in the armory supply room-vault area. They seek to impose liability on defendant on several alternative theories, to wit: (1) negligence in the operation and maintenance of the landfill; (2) nuisance in the operation and maintenance of an ultra-hazardous activity, (3) fraudulent misrepresentation that the land used for armory purposes was fit for such use, (4) strict liability for the generation and release of the methane gas, and (5) constructive trespass in that the gasses generated on the lands of the City traveled onto armory property and harmed persons lawfully present in the armory.

Since the defense of governmental immunity bars recovery only in tort actions, plaintiffs' contentions directed to their alleged contractual relationships with the City will not be considered in this opinion.

After considering the evidence, all the briefs, and the entire record, Judge Lupton concluded that there was no genuine issue as to any material fact on the question of governmental immunity, and that defendant was entitled to judgment as a matter of law. Judge Lupton thereupon allowed defendant's motion for summary judgment on the ground that governmental immunity barred recovery from defendant. Plaintiffs gave notice of appeal, and Judge Lupton entered an order consolidating all cases for appeal.

We allowed writ of certiorari on 14 September 1971 prior to determination by the Court of Appeals.

*White, Crumpler and Pfefferkorn, by William G. Pfefferkorn, for plaintiffs Coltrane and Calhoun.*

*Wilson and Morrow, by Harold R. Wilson, for plaintiffs Gay, Batts and Naylor.*

*Harper and Tisdale, by J. Clifton Harper, for plaintiff Koontz.*

*Hamilton C. Horton, Jr.; Archibald Scales, Jr.; Craige, Brawley, for plaintiff Beer.*

*R. Lewis Alexander for plaintiff Dunevant.*

*C. Edwin Allman; James Armentrout; Hatfield, Allman & Hall, for plaintiff Shore.*

*W. F. Womble, Allan R. Gitter, Eddie C. Mitchell for defendant. Of Counsel: Womble, Carlyle, Sandridge & Rice.*

BRANCH, Justice.

This Court has extensively considered the entry of summary judgment pursuant to Rule 56 of Chapter 1A-1 of the General Statutes in the cases of *Kessing v. Mortgage Corp.,* 278 N.C. 523, 180 S.E. 2d 823, and *Singleton v. Stewart, ante,* 460, 186 S.E. 2d 400. We therefore briefly review the rules of law applicable to entry of summary judgment under that rule.

[1] When there is a motion for summary judgment pursuant to Rule 56, the court may consider evidence consisting of admissions in the pleadings, depositions, answers to interrogatories, affidavits, admissions on file, oral testimony, and documentary materials. The court may consider facts which are subject to judicial notice, such presumptions as would be available upon trial, and any other materials which would be admissible in evidence at trial. The motion shall be allowed and judgment entered when such evidence reveals no genuine issue as to any material fact, and when the moving party is entitled to a judgment as a matter of law.

[2] An issue is material if the facts alleged would constitute a legal defense, or would affect the result of the action, or if its resolution would prevent the party against whom it is resolved from prevailing in the action. The issue is denominated "genuine" if it may be maintained by substantial evidence.

[3] Summary judgment provides a drastic remedy and should be cautiously used so that no one will be deprived of a trial on a genuine, disputed issue of fact. The moving party has the burden of clearly establishing the lack of triable issue, and his papers are carefully scrutinized and those of the opposing party are indulgently regarded. See also Gordon, "The New Summary Judgment Rule in North Carolina," 5 Wake Forest Intramural Law Review 94.

The record shows that plaintiffs allege and defendant admits, or competent evidence, without contradiction, shows: (1) that defendant is a municipal corporation; (2) that at the time of the negligence complained of defendant was engaged in a landfill operation for the purpose of disposing of garbage; (3) that this operation generated methane gas; (4) that for several years, by agreement with Forsyth County, defendant had been disposing of garbage collected outside its territorial limits in return for a payment by the County to defendant of one dollar per ton to dispose of the garbage at the landfill site; (5) that the City had purchased the land adjacent to Silas Creek Parkway, consisting of 84.37 acres, part of which was used for landfill and other municipal purposes, for the sum of $22,019; (6) that the City had sold approximately 26.5 acres for the sum of $255,780; and (7) that a portion of the total land sold by defendant was a 16.1 acre tract sold to Ed Owens during the year 1969 for the sum of $165,000.

Careful examination of the record reveals no genuine issue as to any material fact concerning defendant's landfill operations affecting the question of governmental immunity. Thus, the only question remaining for decision is whether the trial judge correctly ruled, as a matter of law, that defendant was excercising its governmental powers in operating the landfill at the time of the negligence complained of.

This Court has not departed from the rule of govermental immunity adopted in the year 1889 in the case of *Moffitt v. Asheville,* 103 N.C. 237, 9 S.E. 695. The rule set out in *Moffitt* and stated with approval by this Court in *Steelman v. New Bern,* 279 N.C. 589, 184 S.E. 2d 239, is as follows:

"The liability of cities and towns for the negligence of their officers or agents, depends upon the nature of the power that the corporation is exercising, when the damage complained of is sustained. A town acts in the dual capacity of an *imperium in imperio,* exercising governmental duties, and of a private corporation enjoying powers and privileges conferred for its own benefit.

"When such municipal corporations are acting (within the purview of their authority) in their ministerial or corporate character in the management of property for their own benefit, or in the exercise of powers, assumed

voluntarily for their own advantage, they are impliedly liable for damage caused by the negligence of officers or agents, subject to their control, although they may be engaged in some work that will enure to the general benefit of the municipality. . . .

"On the other hand, where a city or town in exercising the judicial, discretionary or legislative authority, conferred by its charter, or is discharging a duty, imposed solely for the benefit of the public, it incurs no liability for the negligence of its officers, though acting under color of office, unless some statute (expressly or by necessary implication) subjects the corporation to pecuniary responsibility for such negligence. . . . "

**[4]** A municipality has only such powers as the legislature confers upon it. *Moody v. Transylvania County,* 271 N.C. 384, 156 S.E. 2d 716; *Shaw v. Asheville,* 269 N.C. 90, 152 S.E. 2d 139.

In 1917 the General Assembly enacted C.S. 2799, which provides:

The governing body may by ordinance provide for the removal, by wagon or carts, of all garbage, slops, and trash from the city; and when the same is not removed by the private individual in obedience to such ordinance, may require the wagons or carts to visit the houses used as residences, stores, and other places of habitation in the city, and also may require all owners or occupants of such houses who fail to remove such garbage or trash from their premises to have the garbage, slops, and trash ready and in convenient places and receptacles, and may charge for such removal the actual expense thereof.

C.S. 2799, later codified as G.S. 160-233, remained effective until 2 January 1972.

**[5]** North Carolina is among the states recognizing the majority rule that the collection, removal and disposition of garbage by a municipality within its territorial limits constitutes a governmental function, and that there can be no recovery for wrongful death or personal injury against a municipality for negligent acts of omission or commission of its agents or servants while engaged in this governmental function. *Stephenson v. Raleigh,* 232 N.C. 42, 59 S.E. 2d 195; *Broome v. Charlotte,*

208 N.C. 729, 182 S.E. 325; *Parks-Belk Co. v. Concord,* 194 N.C. 134, 138 S.E. 599; *Scales v. Winston-Salem,* 189 N.C. 469, 127 S.E. 543; *Dayton v. Asheville,* 185 N.C. 12, 115 S.E. 827; *James v. Charlotte,* 183 N.C. 630, 112 S.E. 423; *Snider v. High Point,* 168 N.C. 608, 85 S.E. 15; 57 Am. Jur. 2d, Municipal, School, and State Tort Liability, Sec. 127; Annotation: "Collection and Disposal of Garbage and Rubbish as Governmental or Private Function as Regards Municipal Immunity from Liability for Tort," 156 ALR 714. However, North Carolina recognizes liability for a *taking or damaging of property resulting from the creation or maintenance of a nuisance* growing out of the disposal of garbage. *Hines v. Rocky Mount,* 162 N.C. 409, 78 S.E. 510; *Little v. Lenoir,* 151 N.C. 415, 66 S.E. 337.

[6] We therefore hold that a landfill operation by a municipality for the purpose of disposing of garbage collected within its territorial limits is a governmental function. Governmental immunity would ordinarily preclude recovery from the municipality for wrongful death or personal injuries caused by the negligent acts or omissions of the municipality's agents or servants. However, appellants contend that the City's operations at the landfill off Silas Creek Parkway were proprietary rather than governmental because (1) defendant contracted with Forsyth County to dispose of the county garbage at the landfill operation in return for the payment of one dollar per ton, and (2) defendant held the landfill property for sale for profit and sold portions thereof for profit.

Defendant contends that it did not depart from the exercise of its governmental powers by contracting with Forsyth County to dispose of county garbage for a fee. Defendant argues that it used the landfill primarily to dispose of garbage for its inhabitants, a governmental function, and that the City did not realize profit from that operation.

In support of its argument, defendant relies upon *James v. Charlotte, supra; McCombs v. City of Asheboro,* 6 N.C. App. 234, 170 S.E. 2d 169; *Osborn v. City of Akron,* 171 Ohio St. 361, 171 N.E. 2d 492; and McQuillin, 18 Municipal Corporations, § 53.46 (3d ed. 1963).

In *James v. Charlotte, supra,* the Court held that the City of Charlotte was engaged in a governmental function when it removed garbage *for its inhabitants* for a fee which covered

Koontz v. City of Winston-Salem

only its actual collection and disposal expenses. We note that in *James* it is stated that the City acted pursuant to C.S. 2799.

In *Osborn v. City of Akron, supra,* the city operated a landfill for the disposal of garbage and allowed individuals and other municipalities to use the landfill for a fee. The plaintiff sued for damages for alleged nuisance created by the city's landfill operation. The Supreme Court of Ohio rejected plaintiff's contention that the operation was proprietary, and stated:

"However, the primary use of this land fill is for the disposition of the garbage and refuse of the inhabitants of the defendant, and the incidental use of such fill by other municipalities and private individuals for a fee does not change the governmental nature of this operation to one of a proprietary nature."

In *McCombs v. City of Asheboro, supra,* the Court of Appeals, in a dicta statement, said:

"As has been stated frequently by courts of other jurisdictions, actual profit is not the test, and the city will not lose its government immunity solely because it is engaged in an activity which makes a profit. *Beard v. City and County of San Francisco,* 79 Cal. App. 2d 753, 180 P. 2d 744 (1947); *Watkins v. City of Toccoa,* 55 Ga. App. 8, 189 S.E. 270 (1936); *Hahn v. City of Ortonville,* 238 Minn. 428, 57 N.W. 2d 254 (1953); *Huffman v. Columbus,* 51 N.E. 2d 410 (1943); *Griffin v. Salt Lake City,* 111 Utah 94, 176 P. 2d 156 (1947); *Marshall v. Brattleboro,* 121 Vt. 417, 160 A. 2d 762 (1960). 'The underlying test is whether the act is for the common good of all without the element of special corporate benefit, or, pecuniary profit.' McQuillin, Municipal Corporations, 3d ed., § 53.29, p. 192 . . . ."

McQuillin, 18 Municipal Corporations § 53.46 (3d ed. 1963), at p. 247, in part, states:

Although there is authority which points to a contrary conclusion, the character of the acts of collecting and disposing of garbage, generally conceded to be governmental functions, is not, it is held by some courts, changed by the fact that a charge is made for the services, or because the municipality derives incidental revenue therefrom.

Conversely, plaintiffs contend that defendant's landfill operation became proprietary when defendant entered into an agreement with Forsyth County to dispose of county garbage for a fee, and when defendant prepared and sold the landfill property for profit.

We examine representative authorities supporting this contention.

In *Oliver v. Worcester*, 102 Mass. 489, the plaintiff was injured by a fall into an excavated area which was dug incident to improvement and maintenance of a city-owned building. Prior to the repairs, the city had leased the basement for use as a city market. After repairs, the city used the building for city offices, board rooms, and meetings of the city governing body. Also, the city rented space to the county for use as a courtroom. The basement was used for police and jail purposes. In considering defendant's plea of governmental immunity, the Massachusetts Supreme Court held that, due to the receipt of rental income, the city was acting in a proprietary function in the operation and maintenance of the building, and that the doctrine of governmental immunity afforded the city no protection. The Court stated:

> ". . . [T]he plaintiff, while walking, using due care, upon a footpath which had been used by the public for more than twenty years, and had been laid out and graded from time to time and prepared and cared for by the town and city of Worcester, and was within the public common which had been used by the inhabitants of the town for a much longer period, fell into a deep excavation, made by direction of a joint committee of the city council, under the authority and at the expense of the city, in the course of repairing and improving a building standing within the common, used by the city principally for municipal purposes, but a substantial portion of which, both before and after the time of the accident, the city leased, and received rent for, either from private persons or from the county, and which was therefore held and used by the city, not for municipal purposes exclusively, but in considerable part as a source of revenue; . . ."

The Court apparently did not consider whether the city actually profited from leasing the building, nor did it discuss or define

its term "in considerable part" as used to describe the rental of the two rooms in the building.

In *Duggan v. Peabody,* 187 Mass. 349, 73 N.E. 206, the town owned and operated a quarry and stone crushing apparatus. The primary purpose of this operation was to provide stone for use in construction and maintenance of public streets. However, during the five-year period prior to the action the town received an average annual income of approximately $441 from sale of crushed stone from the quarry to private users. The Massachusetts Supreme Court held that these facts required application of the principle that "when property is used or business is conducted by a town, principally for public purposes under the authority of law, but incidentally and in part for profit, the town is liable for negligence in the management of it." *Collins v. Greenfield,* 172 Mass. 78, 51 N.E. 454; *Neff v. Wellesley,* 148 Mass. 487-493, 20 N.E. 111, 2 LRA 500; *Worden v. New Bedford,* 131 Mass. 23, 41 Am. Rep. 185.

In *Haley v. Boston,* 191 Mass. 291, 77 N.E. 888, the plaintiff was injured by a wagon hauling ashes picked up by the city from residences for the purpose of disposing of refuse. The city had two ordinances providing for the collection of ashes and garbage. City wagons and personnel picked up household ashes properly displayed by residents. The city performed this service for all residents without charge. City wagons and personnel picked up and disposed of ashes from steam engines for a fee of ten cents a barrel—the cost of collecting and removing the ashes. The Court made a distinction in the performance of the two services, and held that in the performance of the service to all of the householders or residents, the city was not liable for the negligent acts of its agents. Plaintiff's suit was barred because the wagon which struck the plaintiff was engaged solely in removing household ashes at no cost to the householder. However, in a dicta discussion, the Court indicated that there would be liability for negligence in the collection and removal of steam engine ashes because the service, even for a fee that equaled only the expense of collection, was "a matter of contract merely, though doubtless with a view to public convenience."

In *Brown v. City of Sioux City,* 242 Iowa 1196, 49 N.W. 2d 853, the city, incident to the operation of its municipal airport, leased property to various tenants. Plaintiff, one of the

tenants, maintained an apiary on leased property near the airport runways. The city sprayed the runways with chlordane to kill harmful insects. As a result of this spraying plaintiff's bees died and his honey was contaminated. Plaintiff sought to hold defendant liable for negligently killing the bees and destroying the honey. Defendant interposed a plea of governmental immunity. The jury returned a verdict in favor of plaintiff, but the trial judge entered a judgment *non obstante veredicto*. On appeal, the Supreme Court of Iowa reversed the judgment n.o.v. on the ground that the city, by receiving income from incidental use of municipal property otherwise properly engaged in a governmental service, became a proprietor and was liable just as a private individual or corporation would be. In so holding, the Court stated: "A municipality in the exercise of its purely governmental functions, is not liable for negligence. But this rule of governmental immunity is to be strictly construed. . . . Where there is doubt as to whether the city is liable, the question will be resolved against the municipality. . . The city cannot accept and exercise the special privilege of leasing its property to tenants without assuming the responsibilities and liabilities flowing from that relationship."

In *Guthrie v. City of Philadelphia*, 73 F. 688 (E.D. Pa. 1896) the plaintiff sued for damages to his boat caused by negligent operation of the city's ice boat. The ice boat was, by ordinance, entitled to receive compensation for breaking ice, but on this occasion was gratuitously clearing ice around a dock in the State of Delaware. There the Court stated:

"The only defense urged is, in substance, that the city was engaged through its agents, in discharging a public municipal duty, and consequently that it is not responsible for the negligence which caused the injury. The answer to this, in my judgment, is twofold, first that the city owed no municipal duty in Delaware, and second that it was engaged in a private service for the benefit of the owners of the dock, for which it was entitled to compensation. It is unimportant that it performed the service gratuitously. . . ."

In *Town of Douglas v. York* (Wyo.), 445 P. 2d 760, the Court held the municipality liable for fire damage resulting from the negligent operation of the town dump. The basis of the holding was that the town was engaged in a proprietary

function because it charged citizens a fee for disposing of garbage.

We find the following statement in McQuillin, 18 Municipal Corporations § 53.90 (3d ed. 1963) at p. 367:

> The law in regard to liability for torts connected with public property, other than streets and sewers, may be briefly summarized as follows:

> 1. If an income is derived by a municipality from particular property owned or managed by it, it is liable for negligence in the care and management thereof. This is well settled and there are no conflicting decisions. Moreover, the amount of income is generally held to be immaterial as is, generally, the fact that the income is merely incidental.

In *Smith v. Winston-Salem; Thomas v. Winston-Salem,* 247 N.C. 349, 100 S.E. 2d 835, the city voluntarily contracted with persons outside its corporate limits for disposal by the city of sewage generated in households located outside the territorial limits of the municipality. The city allowed the sewage mains serving plaintiffs to become choked up and sewage to back through the service connections into plaintiffs' homes. On appeal this Court reversed a judgment for the plaintiffs on the then recognized doctrine of variance, in that the pleadings alleged a breach of contract and the proof established negligence. This Court, in discussing the powers of a municipality to serve the general public and the status of a municipality contracting to serve persons outside its territorial limits, stated:

> "A municipal corporation, city or town, is an agency created by the State to assist in the civil government of a designated territory and the people embraced within these limits. *Lee v. Poston,* 233 N.C. 546, 64 S.E. 2d 835. Its charter is the legislative description of the power to be exercised and the boundaries within which these powers may be exercised. Neither city charter nor ordinance enacted pursuant thereto have extraterritorial effect unless authorized by legislative grant. *Holmes v. Fayetteville,* 197 N.C. 740, 150 S.E. 624; *S. v. Eason,* 114 N.C. 787; *Dean Milk Co. v. Aurora,* 14 A.L.R. 2d 98; *Hyre v. Brown,* 49 A.L.R. 1230 and annotations; *Donable v. Harrisonburg,* 104 Va. 533, 7 Ann. Cas. 519; 37 Am. Jur. 736.

. . . .

"When plaintiffs, with the assent of defendant, connected their sanitary facilities with defendant's main, defendant impliedly contracted to furnish services reasonably suitable to plaintiffs' need and not to injure plaintiffs by a breach of their contractual obligation. *Defendant, in furnishing these services, was acting in a proprietary capacity. Asbury v. Albemarle,* 162 N.C. 247, 78 S.E. 146." (Emphasis added.)

Plaintiffs rely heavily on the case of *Glenn v. City of Raleigh,* 246 N.C. 469, 98 S.E. 2d 913. In that case the City of Raleigh operated a number of public parks. Plaintiff was injured at Pullen Park when struck by a rock thrown from a lawn mower operated by a municipal employee. The City charged a small fee for admission to the swimming pool, train, and merry-go-round located in the park. It received, during the year plaintiff was injured, approximately $18,000 in net revenue from this park. The cost of the maintenance and upkeep of the Raleigh parks was approximately $158,000 that same year. Plaintiff brought suit for damages for injuries sustained, and defendant moved for nonsuit on the ground of governmental immunity. This motion was overruled. The case was submitted to the jury, and plaintiff recovered. Defendant appealed. This Court granted a new trial for error in the charge, but upon the issue of governmental immunity stated:

"Considering plaintiff's evidence in the light most favorable to him, and disregarding defendant's evidence which tends to establish another and a different state of facts, or which tends to impeach or contradict his evidence, which we are required to do on the motion for judgment of nonsuit *(Atkins v. Transportation Co.,* 224 N.C. 688, 32 S.E. 2d 209; *Singletary v. Nixon,* 239 N.C. 634, 80 S.E. 2d 676), it is our opinion that the net revenue of $18,531.14 for the fiscal year 1 July 1952 to 30 June 1953 received by the city of Raleigh from the operation of Pullen Park for that period, which was used by the city for the capital maintenance of the park area, building items, paying salaries, buying fuel, etc., (the evidence that the $18,531.14 was spent in the amusement area only is the defendant's evidence) was such as to remove it, for the purposes of the consideration of a motion for judgment of nonsuit, from the category of incidental income, and to import such

a corporate benefit or pecuniary profit or pecuniary advantage to the city of Raleigh as to exclude the application of governmental immunity. . . . "

On appeal from retrial, this Court affirmed a judgment for plaintiff. *Glenn v. Raleigh,* 248 N.C. 378, 103 S.E. 2d 482.

The case law *defining* governmental and proprietary powers as relating to municipal corporations is consistent and clearly stated in this and other jurisdictions. However, application of these flexible propositions of law to given factual situations has resulted in irreconcilable splits of authority and confusion as to what functions are governmental and what functions are proprietary. In this jurisdiction the cases of *Glenn v. Raleigh, supra,* and *James v. Charlotte, supra,* preserve this tradition of confusion by adopting apparently divergent views as to the effect of receiving income while performing an otherwise governmental service.

The *Glenn* cases do not disclose that this Court considered whether there was statutory authority for the city to charge a fee for the use of park facilities. It should be noted that in *James* the city was serving only those within its territorial limits and was acting pursuant to a statute which authorized it to remove garbage from habitations and other places from "the city . . . and to charge for such removal the actual expense thereof."

Under the provisions of G.S. 160-234, the City of Winston-Salem had authority "summarily to remove, abate or remedy . . . everything in the city limits, or within a mile of such limits, which is dangerous or prejudicial to the public health; and the expense of such action shall be paid by the person in default and, if not paid, shall be a lien upon the land or premises where the trouble arose, and shall be collected as unpaid taxes."

The City of Winston-Salem did not elect to rely on the provisions of G.S. 160-234, but chose instead to *contract* with the county for disposal of its garbage. By so doing, the City avoided the possibility of being forced to exercise its powers to remove, abate or remedy accumulated garbage which might have become dangerous or prejudicial to the public health of its citizens. Under the agreement between the county and the City, licensed private collectors picked up garbage in areas outside the city limits and delivered it to the city's landfill site. By use of the

contract, rather than the provisions of G.S. 160-234, the City could extend its protection against accumulated garbage and refuse for more than one mile from its territorial limits. Also, the City avoided the possibility of having to collect the cost of removal of garbage pursuant to the statute; and, further, avoided the very real possibility of litigation to enforce the lien provided by the statute. Thus, there were advantages under the contract with Forsyth County which inured to the City's special corporate benefit and thereby brought defendant within the often announced rule that a municipality acts in its proprietary capacity when it receives special "corporate benefit or pecuniary profit." McQuillin, 18 Municipal Corporations § 53.29 (3d ed. 1963) at p. 1692. *Bolster v. Lawrence,* 225 Mass. 387, 114 N.E. 722; *Smith v. Birmingham,* 270 Ala. 681, 121 So. 2d 867; *Dallas v. St. Louis* (Mo.) 338 S.W. 2d 39.

It would seem that the City has again assumed the same posture as in the case of *Smith v. Winston-Salem, supra,* where this Court stated that the City, by rendering its sewage disposal service to persons located outside its territorial limits on a contractual basis, "was acting in a proprietary capacity."

At this point we stand at a crossroads created by the courts' applications of the various rules of governmental immunity. Here, it is impossible not to be impressed by the striking factual similarities between the *Glenn* cases and instant cases. In *Glenn,* as here, the city was exercising a power generally recognized as governmental. In *Glenn,* as here, the city received income which was not an actual profit. In *Glenn* the city received 11.7% of the cost of maintenance of its parks. Here, for the period 1 July 1968 to 1 July 1969 (the fiscal period of the City of Winston-Salem immediately before the explosion in the ensuing month of September), the City received 9.39% of its cost for the landfill operations from payments made by Forsyth County for disposal of its garbage.

We again decline to abrogate the firmly embedded rule of governmental immunity. However, we recognize merit in the modern tendency to restrict rather than to extend the application of governmental immunity. This trend is based, *inter alia,* on the large expansion of municipal activities, the availability of liability insurance, and the plain injustice of denying relief to an individual injured by the wrongdoing of a municipality. A corollary to the tendency of modern authorities to restrict

rather than to extend the application of governmental immunity is the rule that in cases of doubtful liability application of the rule should be resolved against the municipality. *Gorman v. Adams*, 259 Iowa 75, 143 N.W. 2d 648 (1966) ; *Murphy v. City of Carlsbad*, 66 N.M. 376, 348 P. 2d 492; *Brown v. City of Sioux City*, 242 Iowa 1196, 49 N.W. 2d 853; *New Mexico Products Co. v. New Mexico Power Co.*, 42 N.M. 311, 77 P. 2d 634; *Barker v. City of Santa Fe*, 47 N.M. 85, 136 P. 2d 480; *Schultz v. City of Phoenix*, 18 Ariz. 35, 156 P. 75; *Erickson v. Fitzgerald*, 342 Ill., App. 223, 96 N.E. 2d 382.

[7] Applying the rules of law herein stated, we hold that the City of Winston-Salem was exercising powers voluntarily assumed for its own corporate benefit at the time of the negligence herein complained of, and that at the same time the City was receiving revenues over and beyond incidental income, which income "imports such a corporate benefit . . . or pecuniary advantage to the city as to exclude application of governmental immunity."

We hold that the City of Winston-Salem was acting in its proprietary capacity at the time of the negligence herein complained of.

The judgment of the Superior Court is

Reversed.

Chief Justice BOBBITT and Justice SHARP concur in result.