TIMBER INTEGRATED INVESTMENTS, LLC, a NORTH CAROLINA LIMITED LIABILITY
COMPANY, AND MOUNTAIN WORKS ENTERPRISES, LLC, a NORTH CAROLINA LIMITED
LIABILITY COMPANY, PLAINTIFFS
v.
LARRY WELCH, JOAN MISHKIN, RONALD MISHKIN AND THE BALSAM GROUP,
LLC, DEFENDANTS, AND LARRY WELCH, COUNTERCLAIMANT
v.
TIMBER INTEGRATED INVESTMENTS, LLC, a NORTH CAROLINA LIMITED LIABILITY
COMPANY, AND MOUNTAIN ENTERPRISES, LLC, a NORTH CAROLINA LIMITED LIABILITY
COMPANY, HAROLD HEATHERLY, AND PHILLIP DANIEL HEATHERLY, DEFENDANTS
BY COUNTERCLAIM

No. COA12-767

Filed 19 February 2013

**Pretrial Proceedings—summary judgment motion—considera-
tion of affidavits—prejudicial error**

The trial court erred in a case concerning the purchase of a
tract of real property by failing to consider plaintiffs' evidence
during a hearing on defendants' motion for summary judgment.
The court's error was prejudicial as the depositions contained
a sufficient forecast of evidence to establish the existence of a
genuine issue of material fact concerning the individual liability
of defendants.

Appeal by Plaintiffs from Order entered 29 October 2010 by Judge
James U. Downs and Judgment entered 23 February 2012 by
Judge Bradley B. Letts in Haywood County Superior Court. Heard
in the Court of Appeals 28 November 2012.

*Jeffrey W. Norris & Associates, PLLC, by Jeffrey W. Norris and
Jerad R. Davis, for Plaintiffs-Appellants.*

*David R. Payne, P.A., by David R. Payne, for Defendants-
Appellees.*

STEPHENS, Judge.

*Facts and Procedural History*

This case concerns the purchase of a 163-acre tract of real prop-
erty located at 122 Skyland Road in Waynesville, North Carolina ("the
Property" or "the Land"). A portion of the Land was previously an
apple orchard, but has since become contaminated with arsenic and
other substances. As a result, the Property cannot be used for resi-

dential purposes. Plaintiffs Timber Integrated Investments, LLC ("Timber") and Mountain Works Enterprises, LLC ("Mountain") purchased the Property from the Balsam Group ("Balsam") on 22 November 2005. Timber and Mountain were formed by Plaintiffs Harold Heatherly ("Harold") and his son Danny Heatherly ("Danny"), respectively. Balsam was formed by Defendants Larry Welch ("Welch") and Joan Mishkin ("Joan"). Plaintiffs contend that Joan's husband, Ronald Mishkin ("Ron"), also participated in Balsam's organization. This appeal arises from two judicial proceedings in Haywood County, a summary judgment order ("the 2010 order") and the findings of fact, conclusions of law, and judgment which followed ("the 2012 judgment").

The Property was originally owned by two siblings, Carolyn Metts and Paul Davis (collectively, "the Siblings"), who had inherited the land and were interested in selling it. In 2003, Defendants Welch and Ron, along with a third party ("the Third Party"), expressed an interest in purchasing the Property from Metts and Davis. Over the course of discussions about that possibility, Metts informed Welch that the Property could be polluted with a number of contaminants, including arsenic. While Metts discussed the purchase with Welch and Ron, Welch also began talking with Harold Heatherly about selling the Property to Harold. Neither Harold nor his son Danny had visited the site and neither was aware of the potential arsenic contamination.

Later that year, Welch, Ron, and the Third Party executed a contract under the name Arbor Investment Group, LLC, to purchase the Property from the Siblings. That purchase was contingent on an acceptable soil-contamination evaluation. When the soil-contamination evaluation returned, it confirmed Metts's prior statement to Welch—that the Property was contaminated with significant amounts of arsenic and could not be used for residential purposes. As a result, the Third Party withdrew from the transaction. Because of the Third Party's unwillingness to enter the contract, Welch and Ron also terminated the agreement. Welch then sent a letter to ReMax Realty ("ReMax"), which had served as the realtor for both parties, concluding that "[t]he level of arsenic in the soil was found to be much higher than had been expected . . . [and] is entirely too much difference to proceed toward a closing of the subject property."

Despite terminating the contract with the Siblings, Welch maintained communication with Harold Heatherly and assured Harold that he and Ron were getting the matter "resolved" with the Siblings. In an attempt to explain things, Welch falsely blamed the delay on a

**TIMBER INTEGRATED INVS., LLC v. WELCH**

[225 N.C. App. 641 (2013)]

family dispute between Metts and Davis. During that time, Welch continued to represent to Harold that the Property would be an excellent location for residential development.

Two years after the original, failed contract from 2003, Welch contacted Harold with the hope of re-initiating talks regarding purchase of the Property. Welch explained that the fictional Metts-Davis feud had been resolved and again described the Property as well-suited for residential use. For a second time, Harold expressed an interest in purchasing the property.

On 25 August 2005, Welch and Joan entered into a contract to sell the Property to Timber. The contract listed Welch and Joan individually as "Seller[s]." Above their respective names, Welch and Joan had also written "[doing business as] Balsam Group." The contract stipulated that the land did not contain any "existing environmental contamination." Five days later, on 30 August 2005, Joan entered into a second contract and offer to purchase the Property from Metts and Davis, identifying herself as the Buyer and including the words "By: The Balsam Group & or Assigns" typed below her name. Welch's wife, Marge Welch, is listed as the realtor on the contract. The contract contained the following addendum, which

> specifically represent[ed] to Buyer that an apple orchard was part of the subject property and Buyer is accepting said property in "as is" condition, fully aware that the area where the apple orchard was located could contain environmental conditions that would need to be rectified before the area is used for residential purposes.

Six days after Joan contracted with the Siblings and eleven days after Joan and Welch contracted with Timber, on 6 September 2005, Balsam was formed in the State of Delaware. According to the 2012 trial court, Balsam was formed by Welch, Joan, and Ron for the exclusive purpose of committing fraud against Plaintiffs. That court also determined that "[e]ach of the members/partners engaged in and participated in a scheme to defraud plaintiffs and each of them knowingly worked in concert with the others throughout all times relevant hereto."[1]

---

1. Though Defendants have not appealed the trial court's 2012 judgment, they disagree with these findings in their brief, noting that "Larry Welch and Joan Mishkin were the only members of The Balsam Group, LLC" and contending that Plaintiffs failed to support their contentions with regard to any facts that supported claims against the Defendants personally.

After Timber agreed to purchase the Land from Welch and Joan, Harold and Danny "undertook a variety of steps to investigate the Property and to conduct reasonable due diligence." Harold reviewed the contract, searched the Haywood County public records, and walked the boundaries of the property. Harold also talked with some of the neighboring landowners, one of whom mentioned that he "had heard that some medical waste may have been dumped on a portion of the Property." Harold and the neighbor inspected that portion of the Land, but they were not able to uncover evidence of medical waste. According to the 2012 judgment, when Harold questioned Welch about the waste, "Welch stated that he did not know of any such waste." When Harold asked if there was anything else he should know, "like any other waste or contamination," Welch informed him that he was not aware of any. Based on those findings, the 2012 court determined that Plaintiffs would not "have had any interest in the Property had they known it could not be used for residential purposes." During continued meetings between Harold, Welch, and Harold's attorney at that time, Welch persistently represented the Property as free of contamination.

On 28 November 2005, approximately two months after the original purchase contracts were entered into, Balsam acquired the property from Metts and Davis.[2] That same day, Balsam sold the property to Timber and Mountain. Approximately one week after that, Danny learned of the contamination after speaking with a local attorney. The two had been discussing their recent real estate purchases, and the attorney mentioned Danny's purchase of the Property to another individual who worked at ReMax, which had been involved in the transaction between the Siblings and Balsam. That individual knew about the arsenic contamination and promptly called Danny to ensure that he was aware of the situation. Danny informed his father, and Harold quickly confronted Welch. Welch admitted to the situation, but "played [it] down," according to the 2012 judgment. As a consequence, Harold informed Welch that Timber and Mountain were prepared to undo the transaction in order to "fix" the Defendants' failure to disclose the contamination. Welch asked for time to discuss this possibility with his partners, "especially Ron," but "[a]fter months of delays," Welch, Joan, and Ron informed Harold that they were not willing to undo the transaction. Plaintiffs filed suit.

2. The 2012 judgment lists the day of closing as "November 22, 2008." However, all other documentation in the record, including the General Warranty Deed signed by Timber, Mountain, and Balsam, lists the closing date as 28 November 2005.

On 23 November 2009, Plaintiffs moved for partial summary judgment on grounds that: (1) the corporate veil surrounding Balsam should be pierced and the parties should be held individually liable, and (2) Ronald Mishkin was, in fact, a partner in Balsam and should also be held individually liable. Defendants responded on 4 December 2009 by asserting that there were genuine issues of material fact regarding Plaintiffs' allegations and moved for partial summary judgment on a third, unrelated matter. Five days later, on 11 December 2009, the trial court denied Defendants' motion for partial summary judgment. The next year, on 22 September 2010, Defendants filed another motion for summary judgment, which simply alleged that there was no genuine issue of material fact raised by the pleadings, depositions, answers to interrogatories, and admissions of fact and, thus, judgment was proper as a matter of law. Defendants' motion provided no empirical or legal support for its assertions. Plaintiffs responded and renewed their motion for summary judgment in mid-October of 2010. They argued that their claims were supported by "the pleadings filed in this matter, depositions taken and exhibits thereto, the affidavits filed herewith or prior to the hearing, and such other matters as may be properly presented to the Court . . . ." In further support of their motion, Plaintiffs filed affidavits of both Harold and Danny Heatherly, which asserted, *inter alia*, that neither was aware of the Property's condition when the Land was purchased by Timber and Mountain. Defendants responded to Plaintiff's motion on Thursday, 21 October 2010.

The next Monday, on 25 October 2010, the Haywood County Superior Court, the Honorable James U. Downs presiding, held a hearing on the parties' summary judgment motions. Four days later, on 29 October 2010, the trial court entered an order (1) granting Defendants' motion for summary judgment "with respect to the claims asserted by the Plaintiff[s] against the individual defendants Larry Welch, Joan Mishkin and Ronald Mishkin," (2) denying Defendants' motion with regard to Balsam, and (3) denying Plaintiffs' motion for partial summary judgment against Defendants.

One year and four months later, on 23 February 2012, the Haywood County Superior Court, the Honorable Bradley B. Letts presiding, entered judgment as to Balsam. After carefully delineating the facts, the 2012 trial court concluded that "Defendant Balsam Group, by and through its members/partners, committed fraud. . . . violated the Unfair and Deceptive Trade Practices statute. . . . [and] made negligent misrepresentations." The court also found that Plaintiffs had

been damaged and were entitled to recover damages. Accordingly, the court entered judgment in favor of Plaintiffs and against Balsam for $5,442,785.12. The court then trebled that number to $16,328,355.36 and awarded prejudgment interest at $2,406,158.38, punitive damages at $10,000,000.00, and costs at $170,417.45.

Plaintiffs appeal the 2010 order to the extent that it granted Defendants' motion for summary judgment and excluded Defendants from individual liability. Plaintiffs also appeal the 2012 judgment, "[but] only to the extent that the individual defendants Larry Welch, Joan Mishkin, and Ronald Mishkin were not subject to the judgment because of the [2010 trial court order] granting summary judgment in [Defendants'] favor prior to the trial."

### Standard of Review

"Our standard of review of an appeal from summary judgment is de novo; such judgment is appropriate only when the record shows that 'there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.'" *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (quoting *Forbis v. Neal*, 361 N.C. 519, 523–24, 649 S.E.2d 382, 385 (2007)).

### Discussion

Plaintiffs contend that the 2010 trial court erred in granting Defendants' motion for summary judgment as to Plaintiffs' claims against Larry, Joan, and Ron, individually. In support of that assertion, Plaintiffs argue, *inter alia*, that (1) there is a genuine issue of material fact as to whether Ron was a member/partner of Balsam, and (2) Balsam's members/partners should be held personally liable. In addition, Plaintiffs contend (3) the trial court erred by failing to consider the evidence presented by Plaintiffs at the summary judgment hearing. We agree. For purposes of discussion, we first address Plaintiffs' third contention—that the trial court erred by failing to consider Plaintiffs' evidence during the 25 October 2010 hearing on Defendants' motion for summary judgment.

### I. The 2010 Summary Judgment Hearing

In response to Plaintiffs' assertion that Balsam was completely dominated by Welch, Joan, and Ron, the following exchange occurred between the trial court and counsel for Plaintiffs during the 2010 summary judgment hearing:

THE COURT: How have you got that articulated in your response to a summary judgment motion or in support of the one that you're after?

[PLAINTIFFS' ATTORNEY]: We have got that—we've got that articulated in the depositions. It is—

THE COURT: Now, listen to me. You and your predecessors have had this case for going on four years. And I don't think it's—it's wise at all to ask anybody—me or anybody else—to go fishing through your depositions to ferret out a fact that supports some issue that's in dispute. It's your obligation to put up affidavits about what exists and what doesn't exist. Fair enough?

[PLAINTIFFS' ATTORNEY]: Yes, sir.

THE COURT: So let's—now, what I'm asking is forget the depositions. . . .

Plaintiffs contend that the trial court's failure to consider the depositions constitutes reversible error because Plaintiffs were not given a "reasonable opportunity" to present material in opposition to Defendants' motion for summary judgment, citing *Locus v. Fayetteville State Univ.*, 102 N.C. App. 522, 402 S.E.2d 862 (1991). We are not persuaded by Plaintiffs' reliance on *Locus*, but find error nonetheless.

As Plaintiffs rightly note, we determined in *Locus* that the trial court had erred in granting summary judgment for the defendants because it had refused to consider the plaintiff's depositions and not given the plaintiff "a *reasonable opportunity* to oppose the defendants' Rule 56 motion for summary judgment." *Id.* at 528, 402 S.E.2d at 866 (emphasis added). That decision is not applicable here. In *Locus*, the court based its decision on the trial court's conversion of defendants' Rule 12(b)(6) motion to a Rule 56 motion for summary judgment. *Id.* at 526, 402 S.E.2d at 865. When a trial court converts a party's 12(b)(6) motion to dismiss into one for summary judgment under Rule 56, "all parties shall be given a reasonable opportunity to present all material made pertinent to such a motion by Rule 56." N.C. Gen. Stat. § 1A-1, Rule 12(b) (2011). This is because

Rule 12(b) clearly contemplates the case where a party is "surprised" by the treatment of a Rule 12(b)(6) motion as one for summary judgment; it affords such a party a reasonable opportunity to oppose the motion with her own materials made pertinent to such a motion.

*Locus*, 102 N.C. App. at 528, 402 S.E.2d at 866. In this case, Plaintiffs were not subjected to the surprise resulting from the conversion of a Rule 12(b)(6) motion into a summary judgment motion. Therefore, because the trial court's 25 August 2010 hearing in this case was not based on a converted motion to dismiss for failure to state a claim under Rule 12(b)(6), we hold that the 2010 trial court was under no obligation to give Plaintiffs a "reasonable opportunity" to present all materials. *See Raintree Homeowners Ass'n v. Raintree Corp.*, 62 N.C. App. 668, 673, 303 S.E.2d 579, 582 (1983) ("It is significant that the rule provides a 'reasonable opportunity' rather than requiring that the presentation of materials be in accordance with Rule 56.").

Nonetheless, "[i]t has long been the law in North Carolina that in granting or denying a motion for summary judgment under N.C. Gen. Stat. § 1A-1, Rule 56, the trial court may consider the pleadings, depositions, interrogatories, and admissions on file, together with any affidavits which are before the court." *Murdock v. Chatham Cnty.*, 198 N.C. App. 309, 315, 679 S.E.2d 850, 855 (2009) (internal quotation marks, citations, and ellipsis omitted). Rule 56 gives the trial court discretion over whether to consider certain evidence when ruling on a summary judgment motion. That discretion is not so broad, however, as to allow the trial court to flatly refuse to consider competent and potentially relevant evidence that has been offered by one of the parties.

> Summary judgment provides a drastic remedy and should be cautiously used so that no one will be deprived of a trial on a genuine, disputed issue of fact. The moving party has the burden of clearly establishing the lack of [a] triable issue, and his papers are carefully scrutinized and *those of the opposing party are indulgently regarded.*

*Koontz v. City of Winston-Salem*, 280 N.C. 513, 518, 186 S.E.2d 897, 901 (1972). "The goal of summary judgment is to allow the disposition before trial of an unfounded claim or defense," *Weber v. Holland*, 115 N.C. App. 160, 162, 443 S.E.2d 746, 747 (1994), and in pursuit of that goal the trial court "should consider the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits to determine if there are genuine issues of material fact." *See Lavelle v. Schultz*, 120 N.C. App. 857, 861-62, 463 S.E.2d 567, 570 (1995) (quotation marks omitted) (quoting *Meyer v. McCarley & Co.*, 288 N.C. 62, 67-68, 215 S.E.2d 583, 586 (1975)). Accordingly, the trial

court has an obligation to "indulgently regard" the opposing party's papers on a summary judgment motion.

The 2010 summary judgment hearing transcript indicates that the court in this case disregarded that obligation. When Plaintiffs attempted to present their evidence, the trial court abruptly cut off counsel for Plaintiffs with the words "[n]ow listen to me" and refused to consider Plaintiffs' depositions. Though the court couched its refusal in terms of an unwillingness to "ferret out" certain facts in Plaintiffs' library of evidence, we find nothing in the transcript to suggest that Plaintiffs had failed to submit specific, detailed, and well-researched evidence of their claims. Rather, the trial court simply informed Plaintiffs that they needed to "forget the depositions" altogether. This is a violation of the court's obligation in a summary judgment hearing, and we hold that the trial court committed error.

## II. The Corporate Veil

In order to determine whether the trial court's error was harmless or prejudicial, we review Plaintiffs' first contention, that there is a genuine issue of material fact concerning the individual liability of Defendants. In doing so, we consider the depositions and other evidence that was available for review by the trial court at its 2010 summary judgment hearing.

During that hearing, counsel for the Defendants argued to the court that "[t]he affidavits that I have presented do clearly indicate that [Balsam] was formed, and these people—the two members [of Balsam] were Jones[3] and Larry [Welch]. That's it. There's been no refuting affidavits to that fact." Continuing that argument, Defendants now contend that there are simply "no facts which supported the claims against Larry Welch, Joan Mishkin and Ronald Mishkin, personally or the concept that somehow the veil . . . should be pierced." We disagree.

In his 18 January 2008 deposition, Welch testified that Balsam was solely comprised of himself and Joan, with each person having a 50-50 ownership interest in the company. Welch also admitted, however, that "she, I, and him"—referring to Joan, himself, and Ron, respectively—were involved in the organization's decision-making processes. When asked why Joan was a member of Balsam and Ron

3. Given the context of this case and the lack of any party named "Jones," the transcription "Jones" appears to be either a misstatement by the attorney or a mistake by the court reporter, intended in either case as a reference to "Joan" Mishkin.

was not, Welch responded "[t]hat's the way [Ron] wanted it." As the deposition progressed, Welch went on to categorize himself as the manager of the organization and affirmed that the company's only transaction was the one concerning this lawsuit. He also noted that Balsam was formed "on the internet" like the other "[t]hree or four" LLCs in which he held an ownership interest. When asked about Balsam's operating agreement, Welch expressed confusion about the nature of such a document, eventually asserting that the company had one. In answering that question, Welch also noted, variously, that (1) "we have our meetings. We call each other. We talk to each other occasionally on—you know, if there's business to be done," and (2) he "and the Mishkins" had drafted the operating agreement together. When asked about his meeting with Harold—who had just learned of the contamination and was then seeking to undo the deal—the following colloquy occurred between Welch (here, "A") and Plaintiffs' attorney (here, "Q"):

A    . . . . I think at the time, if I'm not mistaken, I told Mr. Heatherly that, you know, before I could do anything, I had to talk with my partner.

Q    Go ahead. I'm listening.

A    And I think we had our breakfast and left.

Q    Did you thereafter talk to your partner about it?

A    Oh, yes.

Q    That's [Ron] we're referring to?

A    Yes. a [sic]

Q    Tell me about that conversation.

A    Well, I explained the situation to him, and, I mean, you know, he was—he was not—you know, he was not willing to—you know, to undo anything.

During his 8 June 2009 deposition, Welch went on to confirm that, in the time leading up to Balsam's purchase of the Land, Ron had contacted him to ask if the property was still available. He clarified that Joan had provided the money for the down payment on the Property and affirmed the statement that "[Ron] had put you in charge of [selling the property to the Heatherlys]." Welch also clarified that Balsam had never filed tax returns.

Joan provided additional details in her 9 June 2009 deposition. There she stated that she had become a member of Balsam, instead of her husband, because she was "trying to establish [her] own credit, get [her] own credit cards, [and] have [her] own stocks . . . ." She also acknowledged that the money she contributed to go into Balsam belonged to both her and Ron and affirmed that "it wasn't particularly important which account it came from."

In his deposition, taken that same day, Ron testified that he did not have any relationship with Balsam. At the beginning of the deposition, he denied "know[ing] any of these people," but affirmed that he is married to Joan Mishkin. When asked who Balsam's members were, Ron replied, "I know Larry Welch and I think Joan Mishkin," but stated that he was not aware of any other members. Concerning Balsam's sale of the property, Ron avowed that he was uninvolved, stating: "Now, I don't know because I wasn't part of it, but that was my understanding, that [Welch] was approached by someone doing bush hogging or something to buy the property." When asked how he learned this information, Ron testified that he heard it "[o]ver dinner with [Welch]." Throughout the deposition, Ron disavowed any decision-making authority over or business relationship with Balsam.

"It is well recognized that courts will disregard the corporate form or 'pierce the corporate veil,' and extend liability for corporate obligations beyond the confines of a corporation's separate entity, whenever necessary to prevent fraud or to achieve equity." *Glenn v. Wagner*, 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985). In North Carolina, we employ the "instrumentality rule to determine whether to disregard the corporate entity and hold parent or affiliated corporations or shareholders liable for the acts of a corporation." *East Mkt. St. Square, Inc. v. Tycorp Pizza IV, Inc.*, 175 N.C. App. 628, 632-33, 625 S.E.2d 191, 196 (2006) (quotation marks omitted). This rule provides that "the corporate entity will be disregarded and the corporation and the shareholder treated as one and the same person, it being immaterial whether the sole or dominant shareholder is an individual or another corporation," if that corporation "is so operated that it is a mere instrumentality or *alter ego* of the sole or dominant shareholder and a shield for his activities in violation of the declared public policy or statute of the State[.]" *Id.* at 633, 625 S.E.2d at 196 (quoting *Henderson v. Fin. Co.*, 273 N.C. 253, 260, 160 S.E.2d 39, 44 (1968) (emphasis in original)).

We consider three elements when evaluating whether to pierce the corporate veil under the instrumentality rule:

(1) Control, not mere majority or complete stock control, but complete domination, not only in finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of [the] plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Glenn,* 313 N.C. at 455, 329 S.E.2d at 330 (citation omitted). When evaluating whether those elements are present in any one particular factual scenario, we consider the following factors:

1. Inadequate capitalization ("thin corporation");

2. Non-compliance with corporate formalities;

3. Complete domination and control of the corporation so that it has no independent identity; and

4. Excessive fragmentation of a single enterprise into separate corporations.

*Id.* at 455, 329 S.E.2d at 330–31. Other factors that may be considered when determining whether to pierce the veil include: "non-payment of dividends, insolvency of the debtor corporation, siphoning of funds by the dominant shareholder, non-function of other officers or directors, [and] absence of corporate records." *Id.* at 458, 329 S.E.2d at 332. These are, however, "merely factors to be considered to determine whether sufficient control and domination is present to satisfy the first prong of the three-pronged [instrumentality rule]." *Id.* No one factor is dispositive. *See id.* Instead, our Supreme Court has instructed us to focus on the "reality" of the situation and determine if "an element of injustice or abuse of corporate privilege" exists such that the corporate entity was used as a "mere instrumentality or tool." *See id.* (citation omitted).

**TIMBER INTEGRATED INVS., LLC v. WELCH**

[225 N.C. App. 641 (2013)]

After a thorough review of the evidence in the record at the time of the 2010 summary judgment hearing, especially the depositions of Welch, Joan, and Ron, we conclude that there is a genuine issue of material fact as to the nature of Balsam and its relationship to Welch, Joan, and Ron. Welch's testimony, in particular, suggests that Balsam may have been dominated entirely by Welch or Welch and Ron. Though the extent to which Balsam was capitalized is unclear, Welch's testimony suggests that the organization adhered to few, if any, corporate formalities. This fact, coupled with Welch's testimony that Balsam had failed to pay any taxes and had not participated in any other business transactions, suggests that there is a genuine issue regarding Balsam's true corporate identity. In addition, though Ron denies any involvement in Balsam, the testimony of Welch and Joan suggests that he was a dominant player, if not the decisive figure. Welch's statements that he needed to confer with Ron about Harold's request to "undo" the contract, coupled with his further representation that Joan, Ron, and he were involved in the creation of the company's operation agreement, suggests a genuine issue as to whether Ron was a member of Balsam in "reality." These questions, coupled with the 2012 trial court's condemnation of Balsam, lead us to the conclusion that the ends of justice warrant a deeper examination of these issues.

Therefore, though Defendants contend that there are "no facts which supported the claims against Larry Welch, Joan Mishkin and Ronald Mishkin, personally or the concept that somehow the veil . . . should be pierced," we find that Plaintiffs' depositions contained a sufficient forecast of evidence to establish the existence of a genuine issue of material fact as to Balsam's true corporate identity and Ron's relationship to the company. Therefore, we reverse the 2010 order and remand to the trial court to determine whether each of the individual Defendants, if any, should be held personally liable for Balsam's actions.

Because we have held that there is a genuine issue of material fact on the issue of Balsam's status as a legitimate limited liability company, we need not address Plaintiffs' additional arguments.

REVERSED AND REMANDED.

Judges STEELMAN and McCULLOUGH concur.